<u>UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK</u>

ROBERT ADAMS, JR.,

                        Plaintiff,

    -against-                                                    05:21-CV-0650 (LEK/ATB)

CITY OF SYRACUSE, *et al.*,

                        Defendants.

**MEMORANDUM-DECISION AND ORDER**

**I.    INTRODUCTION**

Robert Adams ("Plaintiff") commenced this action against the City of Syracuse, Police Chief Kenton Buckner, and nine police officers (collectively "Defendants") on June 3, 2021. See Dkt. No. 1 ("Complaint"). Plaintiff alleges claims under both state and federal law arising from his arrest and subsequent eight-month detainment for a crime he did not commit. Id. Now before the Court is Defendants' motion to dismiss. Dkt. Nos. 7 ("Motion" or "Motion to Dismiss"), 7-2 ("Defendants' Memorandum of Law"). Plaintiff has filed a response, Dkt. No. 9 ("Response"), and Defendants have filed a reply, Dkt. No. 12 ("Reply"). If the facts alleged by Plaintiff are true, Plaintiffs' detainment amounts to a substantial miscarriage of justice. Nonetheless, to the extent that his claims fail the plausibility standard of Fed. R. Civ. 12(b)6, they must be dismissed. For the reasons that follow, the Motion to Dismiss is granted in part and denied in part.

**II.    BACKGROUND**

The following factual allegations are assumed to be true in evaluating the Motion to Dismiss. See Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 76 (2d Cir. 2015).

Plaintiff spent the afternoon of Monday, May 6, 2019, drinking malt liquor with his friend Charles Jones, as well as Vanessa Goldych, and an "acquaintance he recognized from high school, but had not seen in a long time." Compl. ¶ 20. In the early evening, Jones and the acquaintance began to fight over Goldych. Id. Jones was struck in the head and knocked unconscious. See id. ¶ 20. The acquaintance fled the scene. Id.

Plaintiff tried to assist Jones, and sought help from passerby Jordan Bailey, telling her that Jones was his nephew.[1] See id. ¶ 15. Bailey proceeded to call 911 on Plaintiff's behalf. Id. The following is a transcript of her call, which occurred at 7:25 PM on May 6, 2019:

> Dispatch: Mobile 911, Bill, where is your emergency? (0:13)
>
> JB: Um, 9-941 James Street.
>
> Dispatch: 941 James Street?
>
> JB: Yeah.
>
> Dispatch: Chestnut Crossing Apartments?
>
> JB: Yes.
>
> Dispatch: What do you need help with tonight?
>
> JB: Um, I just came out of school from Brand Dishet [phonetic] and I seen a fight and the dude got knocked out and he's really unconscious. It don't seem like he's breathing or anything. (0:34)
>
> Dispatch: Okay, is he inside or outside?
>
> JB: He's outside in the grass.
>
> Dispatch: Outside, okay. What's the closest street corner there?
>
> JB: Um. He's unresponsive. What is – what is the closest street corner to this? Oak.
>
> Dispatch: Oak? Oh, okay. And how many people were fighting?

---

[1] Plaintiff later explained "Charles was like a nephew to me. I'm 57-something years old. Charles is 28." Id. ¶ 19.

JB: It was just, uh, one on one fight.

Dispatch: How many people fighting? Okay, two people were fighting. One person is now unconscious on the floor – on the ground, right? (0:58)

JB: Yes.

Dispatch: Okay, hang on just a second. Do you see any weapons on anybody?

JB: Yes, um, I had definitely seen him use um, uh, like a stick-type rod-looking thing to swing, but um, that's all he has with him, by him. It's knocked out with him.

Dispatch: Okay, is the person who did this still there?

JB: No actually he's not, um, I think he got up out of here (1:24)

Dispatch: Okay, the person who did this – white or black? Male or female?

JB: Um, he was African-American.

Dispatch: About how old?

JB: I didn't get a good look, I don't know what he look like really. I just seen him Running off and I stopped, to talk about, yah mean? Talk to the dude. (1:38)

Dispatch: Okay, all right. Do you have any idea about how old he is?

JB: Um, hey dude, do you know how old your nephew is? (1:44) How old is he? If I can, can I give you an estimate?

Dispatch: Yeah, just approximately.

JB: He looks about – 25.

Dispatch: 25, okay.

JB: I guess.

Dispatch: How tall was he?

JB: He's about 5'7''.

Dispatch: Thin, heavy or medium build?

3

JB: Um, thin.

Dispatch: What was he wearing?

JB: Um, he's, he's wearing…You talking about the one that?

Dispatch: The one that ran off. The one that ran off. (2:10)

Jb: Oh, no, he was kind of bigger, he's got to be like uh 6'3'' like Medium build you know (2:16)

Dispatch: Okay. What was he wearing? What was he wearing?

Jb: Uh, he had on like a green-looking sweatsuit thing. Well, there's officers right here on site, and I'm just gonna tell them what happened. (2:29)

Dispatch: Okay, before you hang up though, can I just get your name please?

JB: Yeah. My name is Jordan.

Dispatch: Jordan what?

JB: Bailey.

Dispatch: spell it.

JB (speaking to officers): I was coming – I was coming out of there, and Um he got into a fight with somebody the other one ran off, but he got knocked out. He's unresponsive now. (2:43) He was, he was hit too in the whole altercation. You see that stick? He was hit with that. He was.

Dispatch: Jordan, can I get your last name again please?

JB: Yes, it's Bailey.

Dispatch: Bailey? B-A-I-L-E-Y?

JB: Yes.

Dispatch: And what's the phone number you're calling from?

JB: [].

Dispatch: Okay, the person whose unconscious breathing?

JB: Um, he's barely breathing sir, he looks like, hurt bad.

4

>Dispatch: Okay, is he bleeding?
>
>JB: Yes, he is, out of his head.
>
>Dispatch: Okay. Is he still unconscious right now?
>
>JB: Yes. We have officers here.
>
>Dispatch: They're with him right now?
>
>JB: Yes.
>
>Dispatch: Okay, very good. Okay, Jordan, thanks for your help.
>
>JB: No problem.
>
>Dispatch: Alright, buh-bye. (3:35)

Id. ¶ 13.

Defendant Officer Cecile's police report indicates that officers were informed of the assailant's description, including that he "was wearing a green sweat suit" while en route to the scene. Id. ¶ 17. When police arrived at the scene, they found Plaintiff near the unconscious Jones. Id. ¶ 21. Plaintiff informed one or more of the Defendant Officers that Jones had been "struck in the head by an unknown black man." Id. ¶ 12. Defendant Officer Russell's body camera video shows Bailey telling the officers "the other dude ran off," to which Plaintiff added "yeah, the guy ran off." Id. ¶ 15. Bailey later declared under penalty of perjury that she "told the female officer that [Plaintiff] had nothing to do with" Jones' injury. Id. ¶ 15. The body camera footage also shows that Plaintiff was wearing a "puffy black jacket, a white polo shirt with some horizontal teal and blue stripes and a grey baseball hat." Id. ¶ 16. Plaintiff is 5'8'' and 175 pounds. Id. ¶ 24.

Plaintiff felt that police were treating him with suspicion, telling Defendant officer Russell "Y'all acting like we done done [sic] something wrong," to which Russell replied "Huh?

5

No, no, we're just trying to get the information. So that way we can put out a point of information regarding the guy who did it." Id. ¶ 18.

While Plaintiff was interacting with police, an ambulance arrived to provide Jones with medical care. Id. ¶ 21. However, these efforts were ultimately unsuccessful, and Jones died from his injuries. See id. ¶ 28.

Police transported Plaintiff and Goldych to the Criminal Investigations Division ("CID"). Id. ¶ 22. Goldych was extremely intoxicated and unable to talk. Id. An officer told Plaintiff that he and Goldych were not under arrest, however, they were placed under arrest upon arriving at the CID. Id. Police radio communications from the time indicate that officers were unsure if Plaintiff was the suspect, including one officer stating "I can't say 100% that he's our actual suspect." Id. ¶ 23. Defendant Officer Cecile also called Bailey back. Id. ¶ 27. She answered the call, and again stated that the perpetrator was wearing a green shirt, also adding that he was 35 to 40 years old. Id. Cecil then called her again to ask her to come identify Plaintiff, saying: "We have someone right now. We just don't know if it's the right person." Id. There is no indication in the record that Bailey came to identify Plaintiff.

Several officers, including Defendants Morticelli, Arduini, Hilts, Brimmer, Toltone, Cecile, Lalonde, Beauchine, and Russell interrogated Plaintiff for an hour and 46 minutes. See id. ¶¶ 28, 32. At the time, Plaintiff remained intoxicated and was "not of sound mind" and "not able to form thoughts." Id. ¶ 31. In his own words as quoted in his Complaint:

> "All I know I was scared. They had me backed in a corner looking at me like I did it . . . . My mind was a mess. Hey, my best friend just died – well, is in a bad way, and I'm being accused, man. I'm scared to death. I might have said anything." The alcohol "slurred me. I was – man, just get it over with, man, say what they – because I'm thinking I still got a chance of going home, so I'm going to say what it is they want to hear, really. That was my

6

> thinking. I know that was crazy, but hey, that's what it – it is what it is."

Id. (quoting Plaintiff).

> Defendant Officers were "making light of what I allegedly had done. You didn't mean to do this, you know, stuff like that. I'm coming to tell them, man, I ain't did nothing, you know what I mean? But they wouldn't buy that at all. They kept constantly badgering me, come on, come on, come on, come on. Stuff like that, you know, like I'm being accused. Well, I was accused of something I didn't do. I'm constantly telling them that I didn't do it, but they don't want to hear that."

Id. ¶ 32. (quoting Plaintiff).

While Plaintiff initially maintained his innocence, he eventually repeated the confession narrative provided to him by police. See id. ¶ 30. After making his false confession, Plaintiff made a statement to the effect that "I can't believe I'm going to jail for something I didn't do." Id.

Plaintiff did indeed spend the next eight months in jail. Id. During that time officers did not further interview witnesses. Id. ¶ 46. When an investigation was finally conducted, including interviews with eyewitnesses, Plaintiff was promptly exonerated. Id. ¶ 30.

In addition to describing his own experience, Plaintiff also presses a claim under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978), alleging "a policy, custom, practice and pattern of conduct in place that enables it [sic] agents and employees [and] police officers to act with deliberate indifference to the constitutional rights of individuals." Id. ¶ 53. Plaintiff provides additional information about the alleged policy, custom, practice and pattern including six other examples of alleged constitutional violations. See id. ¶¶ 53–62. Because Defendants do not seek dismissal of Plaintiff's Monell claim, the Court need not engage with the details of these allegations at this time.

### III. LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of the plaintiff. Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however, requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. Id. at 678–79.

### IV. DISCUSSION

Defendants acknowledge that, if properly pleaded, Plaintiff's claims against Defendant Officers for federal False Arrest, federal Malicious Prosecution, and state law Negligent Training, Discipline, Retention, and Supervision should survive the motion to dismiss stage. Def.s' Mem. of L. at 1. They also acknowledge that Plaintiff's Monell claim against the City of Syracuse should survive. Id. at 2. However, Defendants argue that the remaining claims, including claims for federal False Imprisonment, Fabricated Evidence, violations of Plaintiff's

Fourteenth Amendment liberty interest, violations of 42 U.S.C. §1986, state False Arrest, and Intentional Infliction of Emotional Distress should be dismissed. Id. at 1–2. Defendants also argue that all claims against Chief Buckner should be dismissed, and that Plaintiff has failed to comply with Fed. R. Civ. 8 and 10 and should be required to replead his Complaint. Id. at 2. The Court considers each of Defendants' arguments in turn.

### A. False Arrest and Imprisonment Claims

Plaintiff brings three claims for false arrest or false imprisonment. Plaintiff's first claim is for false arrest under 42 U.S.C. § 1983, Compl. at 17; his second claim is for false imprisonment under § 1983, id. at 19; and his eighth claim is for false arrest[2] under New York State common law, id. at 31. Defendants contend that all three claims are duplicative, and that as such, only Plaintiff's claim for federal false arrest should be allowed to survive. Def.s' Mem. of L. 5–7. In his Response, Plaintiff does not dispute that the three claims are "substantially the same," but argues that courts have nonetheless allowed these claims to persist alongside each other. Resp. at 3–4.

With regard to federal false arrest and false imprisonment claims, Defendants cite cases in which, upon motion to dismiss, courts dismissed plaintiffs' false imprisonment claims as duplicative of their false arrest claims. See, e.g., Robinson v. City of Auburn, No. 14-CV-0702, 2015 WL 513152, at *6 (N.D.N.Y. Feb. 6, 2015). By contrast, Plaintiff cites cases in which courts treated false arrest and false imprisonment together as a single claim. See, e.g., Levantino v. Skala, 56 F. Supp. 3d 191, 199–200 (E.D.N.Y. 2014). Ultimately, this seems to the Court a

---

[2] While Plaintiff has labeled the claim as being for false arrest, he also describes the claim being for false imprisonment. As in the federal context, there is no difference between a state law claim for false arrest and a state law claim for false imprisonment. Here, the Court refers to this state law claims as being for false arrest.

distinction without a difference. However, as courts generally dismiss these duplicative claims upon motion of defendants, the Court here dismisses Plaintiff's federal false imprisonment claim. See Robinson, 2015 WL 513152 at 6 ("Where a plaintiff asserts both a false arrest and a false imprisonment claim against the same defendants, the false imprisonment claim should be dismissed as duplicative."); see also Bowman v. City of Middletown, 91 F. Supp. 2d 644, 660 (S.D.N.Y. 2000).

With regard to Plaintiff's state law false arrest claim, both parties again agree that the claim is substantially the same as Plaintiff's federal false arrest claim. See Def.s' Mem. of L. at 6–7; Resp. at 4. However, here Plaintiffs cite to Olson v. Bradrick, 645 F. Supp. 645 (D. Conn. 1986), where, in a similar context, the court found that "to dismiss the pendent state claim would only encourage wasteful and duplicative litigation" and therefore declined to dismiss the plaintiff's duplicative state law claim. Olson, 645 F. Supp. at 647 n.1. While the Court doubts that dismissal of Plaintiff's state law false arrest claim would lead him to file a duplicative claim in state court, the Court elects to follow this approach. As such, the Court declines to dismiss Plaintiff's state law claim for false arrest and will instead treat it as synonymous with his federal false arrest claim.

### B. Fabricated Evidence Claim

Plaintiff's fifth cause of action is for fabricated evidence in violation of the Fourth and Fourteenth Amendments. "To succeed on a fabricated-evidence claim, a plaintiff must establish that 'an (1) investigating official (2) fabricate[d] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[red] a deprivation of life, liberty, or property as a result.'" Ashley v. City of New York, 992 F.3d 128, 139 (2d Cir. 2021) (quoting Garnett v. Undercover Officer C0039, 838 F.3d 265, 279 (2d Cir.

2016)). Plaintiff bases this claim on his allegation that police officers, who knew he did not match the profile of the suspect, subjected him to interrogation while intoxicated, eventually leading to a false confession. See Resp. at 5–6. Defendants do not dispute that the police interrogators were "investigating officials," nor that Plaintiff's confession was "likely to influence a jury's verdict." See Def.s' Mem. of L. at 7–9. Instead, they argue, first, that Plaintiff's confession was not fabricated because Plaintiff was of sound mind and was not coerced, and second, that Plaintiff's confession did not cause his confinement since it occurred after he had already been arrested. See id.

The Court finds the first of these arguments unavailing. Defendants contend that while Plaintiff claims he was "drunk and not of sound mind" and "unable to form thoughts" at the time of his interrogation, this narrative is contradicted by Plaintiff's description of his "thinking," which led him to make a false confession in the hopes of being released. Id. at 8. However, the Court need not determine whether Plaintiff has pled sufficient facts to plausibly show that his confession was voluntary for the purposes of admissibility. Even if Plaintiff's confession was voluntary, it can still amount to fabricated information if the interrogating officers sought to obtain and did obtain a confession they knew to be false. See, e.g., Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 131 (2d Cir. 1997) (finding summary judgment improper where "a jury could find that [defendant] knowingly took part . . . in the distribution of a confession he knew to be false"). While Plaintiff's claim is not a model of clarity, he does allege that Defendants knew he did not commit a crime, Compl. ¶ 75, and has pled sufficient facts—relating to the circumstances of his arrest and witness descriptions of the suspect—to render this allegation plausible, see generally id. Given that Plaintiff has pled sufficient facts to plausibly allege that

police knew him to be innocent, the Court declines to dismiss his fabricated evidence claim on this ground.

Defendants' second argument is no more compelling. Defendants contend that Plaintiff cannot show his confession to have caused his deprivation of liberty because he was arrested prior to making his confession. Def.s' Mem. of L. at 8–9. However, the fact that a plaintiff was already detained at the time of his false confession does not invalidate his claim of fabricated evidence if the false confession led to extended detention. See Law. v. Cota, No. 16-CV-62, 2017 WL 2572372, at *5 (D. Vt. June 14, 2017) (declining to dismiss claim where a fabricated confession allegedly led the judge to set much higher bail, leading to continued detention). Defendants do not dispute that Plaintiff's confession extended his period of detention, arguing only that it "did not result in Plaintiff's loss of liberty as he had already been arrested and confined." Def.s' Mem. of L. at 9. As such, Defendants' motion to dismiss Plaintiff's fabricated evidence claim is denied.

### C. Fourteenth Amendment Violation

Plaintiff's sixth cause of action alleges a violation of the Fourteenth Amendment cognizable under § 1983. Compl. at 29. Plaintiff's claim states that he was deprived of "his quality of life with his children and family," and that Defendants "knew that the only 'evidence' they had against [him] was the fabricated, coerced confession." Id. ¶ 84. Defendants argue that Plaintiff's claim must be dismissed because it simply "repackage[s] his previously asserted Fourth Amendment violations (namely, false arrest, false imprisonment and malicious prosecution) as Fourteenth Amendment violations." Def.s' Mem. of L. at 9.

Both parties recognize that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that

Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" Def.s' Mem. of L. at 9–10 (quoting Albright v. Oliver, 510 U.S. 266, 273 (1994)); Resp. at 7 (same). However, Plaintiff contends that "[w]hen a government official manufactures false evidence against an accused, and the use of that fabricated evidence results in the deprivation of the accused's liberty, the official infringes the accused's constitutional right to a fair trial in a manner that may be redressable in a § 1983 action for damages pursuant to the Fourteenth Amendment." Resp. at 7. The trouble with Plaintiff's claim thus articulated is that, to the extent his claim is not duplicative of his false arrest, false imprisonment, and malicious prosecution claims, it is duplicative of his fabricated evidence claim. For that reason, Plaintiff is not entitled to pursue his claim under substantive due process and the claim must be dismissed.

### D.  Section 1986 Claim

Plaintiff's Seventh Cause of Action is a claim under 42 U.S.C. § 1986 for negligent hiring, training, supervision and retention. Compl. at 30. However, as Defendants note, "Section 1986 provides no substantive rights; it provides a remedy for the violation of [S]ection 1985," and Plaintiff has not asserted a Section 1985 claim. Def.'s Mem. of L. at 11 (quoting Johnson v. Cook, No. 19-CV-1464, 2021 WL 2741723, at *6 (D. Conn. July 1, 2021)). Plaintiff describes the failure to include a Section 1985 claim as a scrivener's error and requests leave to amend his Complaint in order to add a Section 1985 claim. Resp. at 8. However, to the extent Plaintiff wishes to file an amended complaint, he must follow the procedures described in Local Rule 15.1(a). Furthermore, while Sections 1985 and 1986 deal with conspiracy to interfere with civil rights, Plaintiff's statement of his seventh cause of action focuses almost entirely on seemingly unrelated issues of hiring, training, supervision, and retention.[3] See Compl. ¶ 87–90. While it is

---

[3] The only exception is a direct quote from the text of Section 1986. See Compl. ¶ 87.

possible that Plaintiff has a valid Section 1985 or Section 1986 claim, his Complaint certainly does not "contain ... a short and plain statement of the claim showing that the pleader is entitled to relief" as required under Fed. R. Civ. P. 8. As such, Plaintiff's Seventh Cause of Action is dismissed.

### E. Chief Buckner

In the case caption, Plaintiff names Police Chief Kenton Buckner as a defendant in his individual capacity. Compl. at 1. However, in Plaintiff's third cause of action, he seeks to assert a Monell claim against Buckner. Id. at 20. Defendants argue that this claim must be dismissed as to Buckner because "Monell does not apply to . . . individuals who are sued in their individual capacity." Def.s' Mem. of L. at 17 (quoting Acquah for J.B. v City of Syracuse, 18-CV-1378, 2020 WL 1510405, at *2 (N.D.N.Y. Mar. 30, 2020) (Kahn J.)). Furthermore, Defendants argue, "naming Chief Buckner in his official capacity would be futile as it is axiomatic that naming a decision-maker in their official capacity is considered duplicative of naming the municipal entity in a Monell claim," and Plaintiff has also named the City of Syracuse. Id. at 18 (citing Acquah, 2019 WL 3975463, at *5). Finally, Defendants argue that while Plaintiff has asserted various claims "[a]gainst all Defendants," he has not alleged any facts suggesting Buckner's involvement in any of his other claims. Id.

Plaintiff responds that "but for Mr. Adams mistakenly placing his allegations supporting an individual liability claim against Defendant Chief Buckner within his Monell claim for municipal liability against the City of Syracuse, Mr. Adams has sufficiently alleged conduct sufficient for pleading an individual liability claim against Defendant Chief Buckner." Resp. at 15. However, all of Plaintiff's allegations against Buckner relate to his promotion of a policy or custom of unconstitutional practices or his failure to adequately supervise and train his officers in

14

order to avoid such practices. See Compl. ¶¶ 58–59. And while those allegations may have sufficed to raise a question of personal involvement under Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995), they fail to do so under current Second Circuit precedent as articulated in Tangreti v. Bachmann 983 F.3d 609 (2d Cir. 2020). Under Tangreti, "there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution. The violation must be established against the supervisory official directly." Tangreti 983 F.3d at 618–19 (quoting Iqbal, 556 U.S. at 676). Because Plaintiff has failed to plead Buckner's personal involvement in the violations of his rights, all claims must be dismissed as against Buckner.

### F. Intentional Infliction of Emotional Distress

Defendants argue that Plaintiff's Ninth Cause of Action for intentional infliction of emotional distress ("IIED") should be dismissed because IIED claims cannot be sustained when the conduct at issue can be addressed through traditional tort liability. Def.s' Mem. of L. at 19. Plaintiff responds by pointing out that IIED allows for a mens rea of "recklessness" rather than restricting liability to intentional conduct as required for certain other torts.[4] Resp. at 17. However, Plaintiff has cited no cases demonstrating that this mens rea distinction rebuts Defendants' argument, and the Court is unable to identify any. In a recent decision, this Court noted that the "New York Court of Appeals 'has cautioned that a claim for IIED may not be sustainable "where the conduct complained of falls well within the ambit of other traditional tort liability." ' " Delaney v. City of Albany, No. 18-CV-1259, 2019 WL 125769, at *5 (N.D.N.Y.

---

[4] Plaintiff is correct that IIED, as articulated by the New York Court of Appeals, does not require intentional conduct. Chanko v. Am. Broad. Companies Inc., 49 N.E.3d 1171, 1178 (N.Y. 2016) (noting the IIED requires "intent to cause, or disregard of a substantial probability of causing, severe emotional distress").

Jan. 7, 2019) (Kahn, J.) (finding the relevant conduct to fall "within the ambit of [plaintiff's] claims for false arrest and unreasonable search") (quoting Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 159 (2d Cir. 2014) (quoting Fischer v. Maloney, 373 N.E.2d 1215, 1217 (N.Y. 1978))); see also Lopez v. City of New York, No. 14-CV-1660, 2014 WL 5090041, at *4 (S.D.N.Y. Oct. 10, 2014) ("New York law considers IIED a theory of recovery that is to be invoked only as a last resort, and requires dismissal of an IIED claim based on conduct that falls within the ambit of other tort liability."). Here, the complained-of conduct—Plaintiff's arrest, his interrogation while intoxicated, and his subsequent eight-month detention—fall within the ambit of Plaintiff's false arrest, malicious prosecution, and fabrication of evidence claims. While courts do sometimes allow IIED claims to proceed alongside claims for false arrest, they do so only when the plaintiff has shown that the IIED claim is not duplicative of the false arrest claims. See, e.g., Gonzalez v. Bratton, 48 F. App'x 363, 365 (2d Cir. 2002). Because Plaintiff has failed to make such a showing here, his IIED claim must be dismissed.

### G. Declaratory Judgement

In addition to his causes of action, Plaintiff requests a declaratory judgement that he is factually innocent of the dismissed charges. Compl. at 34. He argues that "the 'state of innocence' that he held, both in an internal, psychological state as well as externally in the community, was stripped away" and that it has not been restored by "the mere dismissal of his criminal charges." Resp. at 18. Defendants respond that the Second Circuit "does not recognize a declaration of innocence, standing alone, as a cognizable form of relief" and that, as such, Plaintiff's request must be dismissed.  Def.s' Mem of L. at 20 (quoting Teichmann v. New York, 769 F.3d 821, 826 (2d Cir 2014) (per curiam)). At this time, the Court declines to address Defendants' argument because it is premature at the motion to dismiss stage. See Chachkes v.

16

David, No. 20-CV-2879, 2021 WL 101130, at *14 (S.D.N.Y. Jan. 12, 2021) ("[Plaintiff] has not moved for a preliminary injunction and the attack on the request for permanent injunctive relief is premature here at the motion to dismiss stage."); City of N.Y. v. A-1 Jewelry & Pawn, Inc., 247 F.R.D. 296, 353 (E.D.N.Y. 2007) ("a motion for failure to state a claim properly addresses the cause of action alleged, not the remedy sought").

### H.  Federal Rules of Civil Procedure 8, 10, and 12

Defendants argue that, by intermingling case citations and legal arguments with factual averments, Plaintiff's Complaint fails to comply with Fed. R. Civ. P. 8. Def.'s Mem. of L. at 24. Defendants note that under Rule 8, a complaint "shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Id. at 22 (quoting Fed. R. Civ. P. 8(a)(2)). Defendants also note that under Fed. R. Civ. P. 12(e), "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Id. (quoting Fed. R. Civ. P. 12(e)).

Defendants describe Plaintiff's Complaint as "difficult to comprehend, and virtually impossible to answer." Id. at 24 (quoting Martinez v. Pittsford Cent. Sch. Dist., No. 04-CV-6229T, 2005 WL 643416, at *1 (W.D.N.Y. Mar. 18, 2005)). Defendants further contend that the Complaint is "written as a memorandum of law" and that it is "difficult to distinguish between fact and law in many of Plaintiff's pleadings, rendering his allegations confusing." Id.

Plaintiff's Complaint is far from a model of clarity. However, in preparing their Motion, Defendants do not appear to have been confused by Plaintiff's allegations. Similarly, the Court

finds Plaintiff's pleading inelegant but not unintelligible.[5] In short, Plaintiff's Complaint is not "so vague or ambiguous that [Defendants] cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). As such, the Court declines to dismiss the Complaint or to strike portions of it.

## V.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Defendants' Motion to Dismiss (Dkt. No. 7) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED**, that Plaintiff's second, sixth, seventh, and ninth causes of action are **DISMISSED without prejudice**, as are all claims against Chief of Police Kenton Buckner; and it is further

**ORDERED**, that Clerk of the Court shall terminate Defendants Chief of Police Kenton Buckner from this action; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules; and it is further

**IT IS SO ORDERED.**

DATED:    March 8, 2022
          Albany, New York

LAWRENCE E. KAHN
United States District Judge

---

[5] "Requests for a more definite statement are generally disfavored and should not be granted unless 'the complaint is so excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to answer it.'" Cole v. New York State Dep't of Corr. Servs., No. 10-CV-1098, 2012 WL 4491825, at *22 (N.D.N.Y. Aug. 31, 2012), report and recommendation adopted, 2012 WL 4506010 (N.D.N.Y. Sept. 28, 2012) (quoting Holmes v. Fischer, 764 F.Supp.2d 523, 531 (W.D.N.Y.2011)).