**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ROBERT ADAMS, JR.,

     Plaintiff,

  v.            5:21-cv-00650 (AMN/MJK)

CITY OF SYRACUSE *et al.*,

     Defendants.

**APPEARANCES:**         **OF COUNSEL:**

**LAW OFFICES OF BONNER & BONNER**  **A. CABRAL BONNER, ESQ.**
3060 Kerner Boulevard – Suite A     **CHARLES A. BONNER, ESQ.**
San Rafael, California 94901
*Attorneys for Plaintiff*

**RYDER LAW FIRM**       **JESSE P. RYDER, ESQ.**
6739 Myers Road
East Syracuse, New York 13257
*Attorneys for Plaintiff*

**CITY OF SYRACUSE**      **DANIELLE R. SMITH, ESQ.**
**CORPORATION COUNSEL**    **TODD M. LONG, ESQ.**
233 East Washington Street
Room 300 City Hall
Syracuse, New York 13202
*Attorneys for Defendants*

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.  INTRODUCTION

On June 3, 2021, Robert Adams, Jr. ("Plaintiff"), commenced this civil rights action against

Police Officers Joseph Tolone,[1] Aaron Cecile, and Lashonda Russell (the "Responding Officers"); Detectives Ryan Brimmer and Jeffrey Beauchine (the "Detectives" and together with the Responding Officers, the "Individual Defendants"); the City of Syracuse ("Defendant City," and, together with the Individual Defendants, "Defendants"); Does 1-100 (the "Doe Defendants"); and others, alleging violations of federal and state law arising from his arrest and subsequent monthslong detention during a since-dismissed criminal prosecution.  Dkt. No. 1 ("Complaint").

Presently before the Court[2] is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, Dkt. No. 77 ("Motion"), Plaintiff's opposition, Dkt. No. 85, and Defendants' reply in further support, Dkt. No. 90.  For the reasons set forth below, the Motion is granted in part and denied in part.

## II.    BACKGROUND[3]

### A.  The Parties

Plaintiff is a black man who has lived in Syracuse for most of his life.  *See, e.g.,* Dkt. No. 77-44 at 16:5-17:4.  In May 2019, he was 55 years old, approximately 5'7" in height and 160 pounds in weight, and lived in an apartment building located at 941 James Street.  Dkt. No. 90-1 at ¶ 515; Dkt. No. 77-23.   At that time, Plaintiff's medical diagnoses included, *inter alia*, alcoholism, depression, and schizophrenia.  Dkt. No. 77-42 at 2-3; Dkt. No. 77-55 at ¶ 454.

---

[1] The Complaint incorrectly spells Officer Tolone's last name as "Toltone."  Dkt. No. 77-55 at 1 n.1.  Citations to docket entries utilize the pagination generated by CM/ECF, the Court's electronic filing system, and not the document's internal pagination.

[2] This case was reassigned to the undersigned on January 19, 2023.  Dkt. No. 34.

[3] Unless otherwise indicated, the following facts have been asserted by the parties in their statements of material facts with accurate record citations, and expressly admitted or not denied with a supporting record citation in response.  *See* N.D.N.Y. L.R. 56.1.  The Court has also considered the parties' other submissions and attached exhibits.  *See generally* Dkt. Nos. 77, 85-86, 90.

Defendant City is a large municipality in New York State with a police department that employs the Individual Defendants. As of May 2019, Officer Cecile had been a patrol officer for approximately two years, Dkt. No. 77-47 at 21:24-22:15; Officer Russell had been a patrol officer for approximately three years, Dkt. No. 77-46 at 9:17-25; Officer Tolone had been a patrol officer for approximately three years, Dkt. No. 77-48 at 9:24-10:2; Detective Brimmer had been a detective for less than three years, Dkt. No. 77-49 at 12:11-13:8; and Detective Beauchine had been a detective for approximately nine years, Dkt. No. 77-51 at 16:21-17:17.

## B. Relevant Events

### 1. May 1, 2016

Shortly after 7:30 p.m. on May 1, 2019, police (apparently including Officer Russell) and emergency medical services found Plaintiff intoxicated and lying on the side of a road in Syracuse. Dkt. No. 77-42 at 2, 50-51; Dkt. No. 77-46 at 104:15-25. Plaintiff was covered in feces and urine and reported drinking six to seven "Na[tt]y Daddy beverages," a brand of malt liquor. Dkt. No. 77-42 at 2, 51; Dkt. No. 77-43 at 49:11-13. Plaintiff was transported to a local hospital emergency room for treatment, where his blood alcohol level ("BAC") was measured at 0.422 percent later that night.[4] Dkt. No. 77-55 at ¶ 311; Dkt. No. 77-42 at 25.

### 2. May 6, 2016

#### a. 941 James Street

At around 3:00 p.m. on May 6, 2019, Plaintiff began drinking in and in front of his apartment building at 941 James Street. Dkt. No. 77-55 at ¶¶ 407, 410. By 4:00 or 5:00 p.m., he

---

[4] A person with a BAC of 0.08 percent is considered intoxicated *per se* under New York's Vehicle and Traffic Law ("VTL"). *See* N.Y. Veh. & Traf. Law § 1192(2); *see also Dalmasi v. City of Mount Vernon*, No. 13-cv-8672, 2014 WL 6645827, at *1 n.3 (S.D.N.Y. Nov. 24, 2014) (noting that a court may "take judicial notice of the VTL in deciding" summary judgment) (citations omitted).

had consumed three or four 24-ounce cans of Natty Daddy. *Id.* at ¶ 411. Around that time, a younger man, Charles Jones, came over to socialize with Plaintiff. *Id.* The two had known each for several years and, while they were not actually related, Plaintiff referred to Mr. Jones as his nephew and Mr. Jones called Plaintiff uncle. Dkt. No. 77-43 at 71:8-15; Dkt. No. 77-44 at 59:1-7, 98:16-23. Plaintiff and Mr. Jones walked to a store to purchase four of five more 24-ounce cans of Natty Daddy that they could share. Dkt. No. 77-55 at ¶¶ 414, 416. Plaintiff paid for the alcohol because Mr. Jones had no money. *Id.* at ¶ 415. The two returned to 941 James Street, where a woman (Vanessa Goldych) and an unnamed man were outside the building. *Id.* at ¶¶ 417, 419, 421-22, 424. Plaintiff continued drinking Natty Daddy and joined Mr. Jones, Ms. Goldych, and the unnamed man in front of 941 James Street. *Id.* at ¶¶ 419-20. At some point, Mr. Jones and the unnamed man got into a verbal altercation, which then turned physical. *Id.* at ¶¶ 421, 424.

### i. 911 call

Shortly before 7:30 p.m., a young woman (Arianna Jordan Bailey) was walking down James Street with her siblings. *Id.* at ¶¶ 1, 339. At that time, Ms. Bailey observed the physical altercation between Mr. Jones and the unnamed man. *Id.* at ¶ 340. Mr. Jones swung a stick at the unnamed man; that man grabbed the stick and proceeded to knock Mr. Jones to the ground. *Id.* The unnamed man then discarded the stick, smashed Mr. Jones' cell phone on the ground, and took off running down the sidewalk. Dkt. No. 85-10 at 4. Mr. Jones was not moving and did not get up, and Plaintiff went to check on him. *Id.* at 5. Plaintiff asked Ms. Bailey to call 911. *Id.* At approximately 7:25 p.m., Ms. Bailey did so. Dkt. No. 77-55 at ¶ 1.

The roughly three and a half minute recording of that 911 call reflects that Ms. Bailey informed the dispatcher that two people had been fighting; one was unconscious on the ground; and "a big type log looking thing" had been involved as a weapon. *Id.* at ¶¶ 2-4; *see also* Dkt. No.

4

77-5.  When the dispatcher asked whether the assailant was still there, Ms. Bailey said "no" and explained that "he got up out of here."  Dkt. No. 77-55 at ¶ 5.

When the dispatcher asked for a description of the assailant, Ms. Bailey said "he was African-American" and she had "just seen him running off."  *Id.* at ¶¶ 6-7.  Ms. Bailey then switched to providing a description of Mr. Jones, whom she described as approximately 25 years old and 5'7".  *Id.* at ¶¶ 8-9.  When the dispatcher clarified that he needed the description of the assailant, Ms. Bailey stated that he was "kind of bigger, he's gotta be like 6'3", like medium build[.]"  *Id.* at ¶ 10.

When the dispatcher asked what the assailant was wearing, Ms. Bailey said "a green lookin' sweatsuit thing" and then explained that "officers [a]re right here on site and I'm just gonna tell them what happened."  *Id.* at ¶¶ 10-11.  Ms. Bailey can then be heard saying "he got in a fight with somebody, the other dude ran off but he got knocked out. . . he was, he was hit too in the whole altercation, you see that stick he was hit with that . . . he was."  *Id.* at ¶ 12; *see also* Dkt. No. 77-16 at 0:05.

### ii.  Police response

Officers Russell, Cecile, and Tolone were the officers who initially responded to 941 James Street between approximately 7:27 and 7:28 p.m.  *Id.* at ¶¶ 14-15.  The 911 call notes indicated "2 PEOPLE FIGHTING – ONE PERSON NOW UNC[ONSCIOUS] ON THE GROUND – COMPL[AINANT] SAW A VERY LG STICK."  Dkt. No. 77-4 at 3; Dkt. No. 77-55 at ¶¶ 16-17. The 911 call notes also reported that the assailant was "'a black male,' 25-35 years old, six feet 3 inches, last seen wearing a green sweat[suit]."  Dkt. No. 90-1 at ¶ 18.  Soon after 7:30 p.m., four other officers arrived at the scene.  *See, e.g.,* Dkt. No. 77-4 at 1-2.

After arriving, each of the Responding Officers activated and de-activated their body worn

cameras ("BWC") at different times.  *See* Dkt. Nos. 77-15, 77-16, 77-17.  Officer Russell's BWC footage initially shows her standing over Mr. Jones, next to Plaintiff (who is also on the ground) and Ms. Bailey, as Officer Cecile exits his police vehicle and walks over.  Dkt. No. 77-16 at 0:00. Ms. Bailey, who was still on the phone with 911 at this time, is visible pointing down at Mr. Jones and saying "he got into a fight with somebody" and "the other dude run off."  *Id.*; Dkt. No. 77-55 at ¶ 21.  Plaintiff says words to the same effect.  Dkt. No. 77-16 at 0:00.

Officer Russell proceeded to ask Plaintiff, who had some blood on his lip, "what happened to you, why you bleeding?"  Dkt. No. 77-55 at ¶ 29.  Ms. Bailey explained "he was hit too" and "you see that stick he was hit with that."  Dkt. No. 77-55 at ¶ 12; Dkt. No. 77-16 at 0:05.  Ms. Bailey subsequently slowly walked down the sidewalk, as Officer Tolone walked past her to join Officers Russell and Cecile by Mr. Jones.  Dkt. No. 77-16 at 0:15; Dkt. No. 77-55 at ¶ 32.  Officer Tolone tended to Mr. Jones, who remained unconscious, with labored, gasping breaths and blood coming from the left side of his head.  Dkt. No. 77-55 at ¶¶ 40-42.

Plaintiff remained near the Responding Officers during this time.  *See generally* Dkt. Nos. 77-16, 77-17.  In response to Officer Cecile's question about who had hit Mr. Jones, Plaintiff said "some motherfucker."  Dkt. No. 77-16 at 1:10.  In response to Officer Russell's question about what that person looked like, Plaintiff pointed down James Street and said it was a "black guy" whom he did not know.  Dkt. No. 77-16 at 1:15.  Following further questions, Plaintiff stated words to the effect of "y'all acting like we did something wrong."  *Id.* at 1:58.  Officer Russell responded "no, no, we just trying to get that information, so that way we can put out a point of information regarding the guy who did it."  *Id.* at 2:03.  Officer Russell again asked about Plaintiff's lip; Plaintiff responded that it was "a long story" and unrelated to Mr. Jones.  *Id.* at 2:28. In response to Officer Russell's question, Plaintiff confirmed that he, Mr. Jones, and Ms. Goldych

had been drinking with a fourth person. *Id.* at 2:54. Plaintiff also stated that the fourth person hit Mr. Jones, and that this person's name was "Pete." *Id.* Officer Russell then confirmed this version of events with Ms. Goldych. *Id.* at 3:00. In response to further questioning from Officer Russell, Plaintiff provided his name, address, and birthdate. *Id.* at 3:47, 4:10. Plaintiff again stated words to the effect "y'all acting like we done something," to which Officer Russell responded "no, we just need your info so that way you can help us, that's all." *Id.* Soon after, Officer Russell again asked "were you two fighting each other," to which Plaintiff responded "no." *Id.* at 5:45.

Approximately thirty seconds later, at 7:34 p.m., Officer Tolone directed Plaintiff to stand up and turn around, quickly patted him down, and informed Ms. Goldych "you're gonna get detained too dear." Dkt. No. 77-17 at 4:34. Officer Tolone then told Plaintiff "you're being detained right now" and placed Plaintiff in handcuffs. *Id.* at 4:53. Officer Tolone walked Plaintiff over to a police vehicle and said "stand right here; don't move," before unlocking the vehicle and directing Plaintiff into the backseat. *Id.* at 5:10.

The Responding Officers proceeded to put up police tape around the scene. *See, e.g.,* Dkt. No. 77-16 at 7:43. At approximately 7:38 p.m., Officer Russell remarked to Officers Tolone and Cecile that "we don't have anything to put out a point for, except for it was a black man." *Id.* at 9:54. Officer Tolone responded, "it's the guy we have in the car, I can almost guarantee it," Dkt. No. 77-17 at 8:27, and Officer Cecile agreed, saying "it's definitely him."[5] Dkt. No. 77-15 at 1:41.

At approximately 7:39 p.m., Officer Tolone asked various officers "have we started a canvas yet guys?" Dkt. No. 77-17 at 9:54. Officer Russell responded "yeah, we'll do that right now. I wish we would have got those people that were . . ." and gestured down the sidewalk in

---

[5] During his deposition, Office Cecile characterized this statement as "police banter." Dkt. No. 77-47 at 74:13-17 ("Q. So, it's definitely him doesn't mean -- it doesn't mean that you were sure it was him? A. Right. That's police banter. I wasn't sure.").

the direction Ms. Bailey and her siblings had walked.  Dkt. No. 77-16 at 11:27.  At approximately

7:40 p.m., the Responding Officers spoke with two non-party officers who arrived after they did.

*See, e.g.,* Dkt. No. 77-17 at 10:14.  One of the non-party officers asked "what's up with the guy

with the busted lip," to which Officer Tolone responded "yeah, I'm thinking that's gonna, like you

said, that's gonna be our guy."  *Id.*

At approximately 7:41 p.m., Officer Cecile called the Criminal Investigations Division of

the Syracuse Police Department ("CID").  Dkt. No. 77-15 at 4:55.  Officer Cecile reported that

"we've got possible suspects, I don't know, they're totally drunk, I don't know if someone wants

to show up down here or not."  *Id.* at 5:35.  During the course of this call, Officer Cecile asked

Officer Russell for the name of "the guy, the suspect . . . the guy that we got detained right now,"

and then provided Plaintiff's name as "the possible suspect."  *Id.* at 8:19.

At approximately 7:45 p.m., Officer Russell asked Officer Tolone, "did anyone contact

those people back," Dkt. No. 77-16 at 17:21, presumably again in reference to Ms. Bailey and her

siblings, to which Officer Tolone responded that he tried but they did not want to meet, Dkt. No.

77-17 at 15:51.  Officers Tolone and Russell then canvased the area for additional eyewitnesses,

without success.  *See, e.g.,* Dkt. No. 77-55 at ¶ 76; Dkt. No. 77-17 at 18:30.

At approximately 7:47 p.m., seemingly while on hold with CID, Officer Cecile stated to

other officers on the scene that "I'm just going to call back the [911] caller, because they obviously

saw it, and see if they want to talk and give us the, uh, a statement of what happened, once I'm

done with CID."  Dkt. No. 77-15 at 10:57.  After the call with CID resumed, Officer Cecile

reiterated to the person with whom he was speaking that "he's totally, he's totally wasted, so how

much that would do, I don't know" before saying words to the effect that he would "try and give

the [911 caller] a call" and "see if she witnessed who did it . . . and maybe she'll give us a

statement." *Id.* at 12:39.

At approximately 7:50 p.m., Officer Cecile again informed one of the other officers at the scene that he was going to contact the 911 caller "to see if they could give us a statement since they're all wasted, and then, you know, to [see] who hit him with it, because obviously they saw the whole thing." *Id.* at 14:16. Officer Cecile then spoke with Ms. Bailey and asked if she could provide "an ID of who the suspect is, because right now all we've got is three people that are intoxicated, nobody's owning up to hit, hitting this, uh, gentlemen with a stick." *Id.* at 14:50. Officer Cecile went on to ask "do you remember what the, uh, what the guy that hit him with a stick was wearing," before repeating "a green shirt." *Id.* at 16:01. Officer Cecile then clarified "the guy that got knocked out was, like, in his mid to late 20s, and it was, like, an older guy, like 35 to 40, that hit him?" *Id.* at 16:43. After the call ended, Officer Cecile shared with other officers on the scene that he had spoken with Ms. Bailey, and said that Mr. Bailey had said the assailant "was wearing a green shirt, he's got a green vest on," to which another officer responded "yeah, it's this guy," presumably in reference to Plaintiff. *Id.* at 17:20. Officer Cecile then tried to call Ms. Bailey again, and asked if she would come back to identify the person she had seen fighting with Mr. Jones. *Id.* at 18:30. Ms. Bailey did not agree to do so, in part because she had just "seen a fight, I don't want nobody looking for me or anything." *Id.* at 18:45.

While officers identified numerous video cameras that could contain footage of the incident, no such footage was retrieved. *See, e.g.,* Dkt. No. 77-16 at 24:15; Dkt. No. 77-55 at ¶¶ 86, 134, 316, 383-84.

Shortly before 8:00 p.m., Plaintiff was removed from the police vehicle to be photographed by a non-party officer. Dkt. No. 77-16 at 31:11; Dkt. No. 77-55 at ¶ 113. During this process, Officer Russell walked over and asked Plaintiff "you being good Robert" and "how'd that thing

go the other day when you shit your pants?"[6] *Id.* at 31:22.  Plaintiff appears to have mumbled that

he "got drunk." *Id.* at 31:29.  The non-party officer photographing Plaintiff directed him to ball

his hands up behind his back.  *Id.* at 31:38.  After leaning down to examine Plaintiff's hands and

knuckles—presumably for blood or injuries—this officer did not photograph them.  *Id.*

Plaintiff then exclaimed "I want to know what I did," to which Officer Russell responded

"we're trying to figure that out too." *Id.* at 31:50.  As the non-party officer placed Plaintiff back

in the vehicle, Officer Russell asked Plaintiff "you nervous," to which he responded "yeah." *Id.*

at 32:00.

### 3.   Criminal Investigations Division

Officers Tolone and Cecile transported Plaintiff and Ms. Goldych from 941 James Street

to CID.  Dkt. No. 77-6 at 5.  Officer Tolone placed Plaintiff in a holding room, where he remained

detained for several hours.  Dkt. No. 77-8 at 3.

At some point during the hours that Plaintiff was detained at CID, Detective Brimmer and

a non-party detective appear to have traveled to 941 James Street to investigate the scene.  *See*

Dkt. Nos. 77-13, 77-19.  Detective Brimmer's police report indicates that he also reviewed the 911

call notes at this time.  Dkt. No. 77-19 at 2.  The non-party detective assisting Detective Brimmer

in canvassing the apartment building documented that one of the witnesses "stated that he did not

know the men who drank in the parking lot, but stated that he observed three men and one woman

drinking beer in the lot this afternoon." Dkt. No. 77-13 at 2.  Once back at CID, Detective Brimmer

tried to speak with Ms. Goldych, but determined that she "appeared extremely intoxicated" and

---

[6] Officer Russell testified during her deposition that she already knew Plaintiff from "[p]rior incidents," none involving violence.  Dkt. No. 77-46 at 104:16-25.

"was unable to speak due to apparent intoxication."[7]  Dkt. No. 77-19 at 2.  Detective Brimmer's police report states that "[b]ased on the 911 caller[']s description of the incident" and Plaintiff's presence at the crime scene, "he was being considered a likely suspect."  *Id.* at 3.

Once Detective Brimmer returned to CID, he and Detective Beauchine moved Plaintiff into a small interrogation room at approximately 10:30 p.m.  Dkt. No. 77-55 at ¶ 141; Dkt. No. 77-21 at 0:00.  Plaintiff remained in this room until he was placed back in handcuffs at approximately 1:00 a.m.  *See generally* Dkt. No. 77-21.  Shortly after 10:30 p.m., Detective Brimmer read Plaintiff his *Miranda* rights.  Dkt. No. 77-55 at ¶ 154.  Plaintiff proceeded to speak with the Detectives.  In response to Detective Brimmer's initial question about "[w]hat happened over there, man," Plaintiff stated "[w]ell, what happened -- my nephew got into it with some guy.  You know, and -- you know, they was fighting and stuff, you know.  And I'm drunk.  You know what, hey, here I am.  That's what happened."  Dkt. No. 77-22 at 6:18-23.

The parties dispute the extent of Plaintiff's intoxication during the approximately two and half hours that he remained in the interrogation room.  Sometime after approximately 1:00 a.m. on May 7, 2019, when Plaintiff's booking process began, his BAC was measured at 0.15 percent, or nearly twice the legal limit to operate a motor vehicle.  Dkt. No. 77-24; *see also supra* n.4.

---

[7] Seemingly in the early morning of May 7, 2019, Detective Brimmer again tried to speak with Ms. Goldych, who "still seemed too intoxicated" and "could speak a little but was talking about outlandish things not related to this incident."  Dkt. No. 77-19 at 3.  When Detective Brimmer spoke with Ms. Goldych a third time, at some point later on May 7, 2019, she "seemed much less intoxicated."  *Id.*  While in that state, Ms. Goldych apparently told Detective Brimmer, *inter alia,* that she was "drunk[] at the time of the incident and does not remember all of the details" and that "she was unaware that Jones had been injured."  *Id.*  Detective Brimmer did not take a written statement from Ms. Goldych.  *Id.*; *see also* Dkt. No. 77-30 at 2 (non-party detective's report stating that when he subsequently spoke with Ms. Goldych "[i]t should be noted throughout our conversation V. Goldych referred to 'spiritual incidents' as well as being visited by 'higher powers' on several different occasions.  She often had a difficult time organizing her thoughts and at times did not directly answer questions.  Based upon her actions and statements her mental health status is unknown to me at this time.").

According to one of Defendants' retained experts (Robert L. Weisman, D.O.), the physiological effects of such a BAC are that "[m]otor function, speech, and judgment are all severely affected at this height of blood alcohol.  Staggering, and slurred speech, may be observed."[8]  Dkt. No. 77-52 at 10.

Based on Dr. Weisman's review of numerous record materials and his examination of Plaintiff in June 2024, his expert psychiatric report contains several other findings that are relevant for purposes of summary judgment.  *See generally id.*  First, Dr. Weisman determined that—when sober—"Mr. Adams has deficits in his *Miranda* understanding, particularly regarding legally acceptable deceptive police practices as well as other specific aspects of remaining silent versus talking to the police."  *Id.* at 7, 9.  Based on certain of Mr. Adams' test scores—again, when sober—Dr. Weisman also concluded that Plaintiff's "basic understanding of *Miranda*" ranked in the eighteenth percentile of pretrial defendants.  *Id.* at 8-9.  Defendants take the position in the Motion that "Dr. Weisman's opinions are unrebutted."  Dkt. No. 77-56 at 20.

Beyond the extent of Plaintiff's intoxication, the parties also dispute the voluntariness and significance of various statements Plaintiff made during his interrogation by the Detectives.  In sum, the Detectives refused to accept Plaintiff's version of events, and instead told Plaintiff that video evidence, forensic evidence, and numerous witnesses all established that he had fought Mr. Jones; Plaintiff just needed to provide the details.  *See generally* Dkt. No. 77-22.  For example:

| Det. Beauchine: | Okay.  Hit the reset button.  All right, okay. |
| Det. Brimmer: | Why don't we start at the beginning and tell the truth? |

---

[8] Dr. Weisman further opined that "[t]o help determine typical reductions in human BAC, clinical services often utilize a declination rate of 0.015% per hour."  Dkt. No. 77-52 at 11.  This suggests that Plaintiff had a higher BAC several hours prior, when Detective Brimmer read Plaintiff his *Miranda* rights.  Dkt. No. 77-55 at ¶ 154.  Presumably, the corresponding physiological effects identified by Dr. Weisman would have been more severe at that time and during the interrogation.

| | |
|---|---|
| Plaintiff: | That's the truth. |
| Det. Brimmer: | No. |
| Det. Beauchine: | No, it's not.  Listen, listen.  It's not.  We can do this over -- |
| Plaintiff: | Okay.  Then you tell the truth, then.  Okay? |
| Det. Beauchine: | I don't need to tell the truth.  You're the one that needs to -- |
| Plaintiff: | Well, well, I'm telling you what I -- I'm telling you what as far as I know. |
| Det. Brimmer: | You were there.  You were part of this. |
| Det. Beauchine: | Yes. |
| Det. Brimmer: | So you should -- |
| Plaintiff: | That's what I'm saying. |
| Det. Brimmer: | -- you should know, then. |
| Plaintiff: | Okay.  That's what I'm saying.  Okay, I'm trying to tell y'all what happened.  You telling me I'm lying. |
| Det. Beauchine: | Well, let me put it to you like this.  Okay? |
| Plaintiff: | Oh, man.  That -- |
| Det. Beauchine: | We got several people saying that you, all right, got into an argument with this guy, and that you hit him with a stick. All right?  Just hear me out.  Hear me out.  Okay?  And that you hit him with a stick, and that you hit him so hard that he got knocked out and went to the ground. |
| Plaintiff: | No. |
| Det. Beauchine: | And so we're trying to verify whether or not you intentionally hit him -- |
| Plaintiff: | No.  No, no, no, no, no. |
| Det. Beauchine: | -- because you're a predatory person who wants to go out there and hurt people and do bad things to people, or if this is just a family argument that went awry and -- |

13

| | |
|---|---|
| Plaintiff: | No. |
| Det. Beauchine: | Okay. |
| Det. Brimmer: | He ended up falling and hitting his head or something. |
| Det. Beauchine: | Right.  And that's exact -- |
| Plaintiff: | Oh, no. |
| Det. Beauchine: | -- that's (indiscernible). |
| Plaintiff: | No. |
| Det. Beauchine: | Okay.  That's what we're facing, so did -- was this something where you are a predator?  You intentionally attack people with things -- |
| Plaintiff: | No. |
| Det. Beauchine: | -- or whatever -- whatever you have available to you?  Or is this just something that just -- |
| Plaintiff: | I don't hurt nobody. |
| Det. Beauchine: | -- listen, listen.  Or is this something where you, a couple guys are having a couple drinks and some shit is said, and it's a family matter and shit went south, and it was more of an accident than anything else, or are you intentionally going around doing stuff like this?  This is -- |
| Plaintiff: | No. |
| Det. Beauchine: | Okay.  Which of the -- |
| Plaintiff: | No. |
| Det. Beauchine: | -- which of the two is it? |
| Plaintiff: | Nothing.  Not one. |
| Det. Beauchine: | No, no.  Which -- no, no, no.  I'm -- |
| Plaintiff: | I just happened to be there. |

14

| | |
|---|---|
| Det. Beauchine: | You didn't just happen to be there. Okay? |
| Plaintiff: | I didn't even hit the guy. |
| Det. Beauchine: | Not with your hand. |
| Plaintiff: | I hit nobody. |
| Det. Beauchine: | You say not with your hands, because you're showing us your hands. We know that. All right? We know that. |
| Det. Brimmer: | Listen, it was a mistake, and you didn't mean for him to get hurt like that, that's a big difference than if you go out there trying to hurt people. |
| Plaintiff: | I ain't hit him. |
| Det. Brimmer: | It's a huge difference. |
| Plaintiff: | I didn't. Man, I swear to God I didn't. I didn't. |
| Det. Brimmer: | It's a huge difference. |
| Plaintiff: | I just happened to be there. |
| Det. Brimmer: | No. |
| Plaintiff: | I witnessed the thing. |
| Det. Brimmer: | That story is not going to fly. |
| Det. Beauchine: | Right. When people -- |
| Det. Brimmer: | It's not going to hold up. |
| Det. Beauchine: | -- when people see the video and they talk to someone -- |
| | . . . . |
| | They're going to see you in a certain fashion. And that's without you saying anything, right? So if you give your side of the story, and give your thoughts, and what was going through your head at the time, listen, it puts people in your perspective and in your shoes. Now, it doesn't -- and here's what I would say. It -- |

15

| | |
|---|---|
| Plaintiff: | I didn't do nothing. |
| Det. Beauchine: | Hold on, listen to me.  It doesn't always make it right. |
| Plaintiff: | I'm telling you.  I didn't do this. |
| Det. Beauchine: | People will understand if you put them in your shoes, and you can only do that by talking. |
| Plaintiff: | I don't give a -- |
| Det. Beauchine: | By telling us. |
| Plaintiff: | Well, I'm telling you. |
| Det. Beauchine: | Yeah. |
| Plaintiff: | I'm telling you how it happened.  Okay?  I didn't -- |
| Det. Beauchine: | Were you shooing him away with the stick, or did you mean to hurt him with the stick? |
| Plaintiff: | No.  No. |
| Det. Beauchine: | What were you doing? |
| Plaintiff: | Wait a minute.  You put -- you put words -- |
| Det. Beauchine: | No, no, no.  I'm asking you.  It's a question. |
| Det. Brimmer: | We're trying to get to the -- |
| Plaintiff: | -- you're putting words in my mouth. |
| Det. Brimmer: | -- we're trying to get to the bottom of this. |
| Plaintiff: | I'm telling you.  Charles was fighting this guy.  Okay?  Next thing I know -- |
| Det. Beauchine: | We're past that.  We're past that.  Alright?  We're past that. We know. |
| Plaintiff: | And -- |
| Det. Beauchine: | We're past that.  All right?  Listen, relax. |

16

| | |
|---|---|
| Det. Brimmer: | Just help us understand. |
| Dt. Beauchine: | Help us understand what happened. All right? Between you and Charles. |
| Det. Brimmer: | I mean, you got a wound on your face. That could be a defensive wound, you know. It could -- |
| Plaintiff: | No. I ran into a tree being drunk. |
| Det. Beauchine: | Okay. So is it safe -- how often do you drink? |
| Plaintiff: | Hmm? Every day. |
| Det. Beauchine: | Okay. Could this be -- |
| Plaintiff: | All day. (laughs) |
| Det. Beauchine: | -- could this -- listen, could this be a mistake between you and Charles -- |
| Plaintiff: | No. |
| Det. Beauchine: | -- because you were intoxicated and -- |
| Plaintiff: | No, no, no no. |
| Det. Beauchine: | -- he was intoxicated? |
| Plaintiff: | No, no, no, no, no, no, no. No, no, no, no. Really, me and Charles ain't got no problem at all. |
| Det. Beauchine: | Well, you did tonight. |
| Plaintiff: | No. Hmm-mm. |
| Det. Beauchine: | You did. |
| Plaintiff: | No. No. No. Huh-uh. |
| Det. Beauchine: | You might not want to think that you might have had a problem, but -- |
| Plaintiff: | No, man. |
| Det. Beauchine: | -- you get -- you had a problem with him tonight. |

| | |
|---|---|
| Plaintiff: | No. |
| Det. Beauchine: | Or he had a problem with you, and you were defending yourself, tell us. |
| Plaintiff: | No, no, no, no. |
| Det. Brimmer: | Did he start talking about Vanessa and upset you? |
| Plaintiff: | No. |
| Det. Brimmer: | No? |
| Det. Beauchine: | You had a problem with him tonight. |
| Plaintiff: | Me and Vanessa had walked up. They happen to over sitting -- sitting down, drinking. And still we was drinking. Okay, next thing I know, they fighting. Really. Really, man. Period. |
| Det. Beauchine: | Was this an accident or did you mean to hurt him? |
| Plaintiff: | Man -- I didn't hurt him. |
| Det. Beauchine: | You meant to hurt him? |
| Plaintiff: | I never hurt him at all. |
| Det. Beauchine: | It was an accident? |
| Plaintiff: | Why do you -- why are you trying to put words in my mouth? Okay? Huh? |
| Det. Brimmer: | We're not trying to. We just want to get to the bottom of this. |
| Plaintiff: | Man, where -- well, where the bottom -- we're at the bottom of [sic]. I was telling you. |
| Det. Brimmer: | We're just going in circles. |
| Plaintiff: | I didn't do nothing. I was a witness. That don't -- this they got -- |
| Det. Brimmer | We're just going in circles here. . . . |

*Id.* at 51:2-59:19.

During the interrogation, Plaintiff's cellular phone rang. The Detectives instructed Plaintiff not to answer the phone, to turn it off, and to place it on the table. *Id.* at 27:6-20. At approximately 11:14 p.m., just prior to the first break taken during the interrogation, Detective Brimmer said that he was going to take Plaintiff's phone outside the room. *Id.* at 60:24-25; *see also* Dkt. No. 77-21b at 13:50. Plaintiff responded, "[m]an, give me my phone," to which Detective Brimmer replied "[n]o, it's going to sit out here." Dkt. No. 77-22 at 61:1-3. During this break, Plaintiff is visible talking to himself and unsuccessfully trying to open the interrogation room's door, which appears to have been deadbolted from the outside. Dkt. No. 77-21b at 14:00-17:00. Plaintiff subsequently informed the Detectives that he was not currently working because he had a "dual diagnosis" and that his psychiatrist, counselor, and primary care doctor were all at the same local healthcare provider. *Id.* at 102:16-103:16; *see also United States v. Moran*, 778 F.3d 942, 951 (11th Cir. 2015) ("[D]ual diagnosis patients are those suffering from both substance abuse *and* acute mental disorders.").

Plaintiff contends that he denied assaulting Mr. Jones nearly 200 times before the Detectives coerced him into providing a false confession around midnight. Dkt. No. 85-2 at ¶¶ 570-71. During the subsequent break, Plaintiff can be heard saying "I'm going to jail for something I didn't do,"[9] Dkt. No. 77-21c at 8:49, and further talking to himself, *see, e.g., id.* at 9:10, 11:23.

Defendants contend that Plaintiff's eventual confession was not coerced and not false. Dkt. No. 77-56 at 9, 25. Presumably to support this position, Defendants requested that Dr. Weisman

---

[9] The transcript Defendants provided inaccurately characterizes Plaintiff's statement as "[m]umbles incoherently." Dkt. No. 77-22 at 105:7.

opine on Plaintiff's capacity during the May 2019 interrogation. Dkt. No. 77-52 at 11, 12. As

relevant here, Defendants requested that Dr. Weisman determine whether Plaintiff had the "proper

requisite intellectual capacity and base intelligence level" and the "proper requisite psychological

state and mental health capacity" to have:

> . . . .
>
> (c) understood the significance and context of the questions being asked regarding
> the assault of Charles Jones; . . .
>
> . . . .
>
> (f) understood [the] significance and context of his answers to those questions with
> respect to the assault of Charles Jones; . . . .
>
> (g) observed the events for which he was being questioned, illustrated the ability to
> recall those same observations, and provided answers based upon those
> observations and recollections (even if, under certain circumstances, Plaintiff was
> deceptive in his response); . . . .
>
> (h) [had] the ability (or exhibited the ability) to communicate his answers truthfully,
> effectively, clearly and coherently; . . . . . and
>
> (i) provided the answers of his own accord.

*Id.* at 11-12, 12-13. In response to every one of these items, Dr. Weisman concluded:

> Initially, yes, but towards the latter part of the ~1.5-hour interview, Mr. Adams
> being under the combination of duress, fatigue, limitations of his legal knowledge,
> and some level of alcohol intoxication, became emotionally and cognitively
> distressed, resigned, and compelled to offer the narrative of the crime being
> demanded of him.

*Id.* at 11-12, 12-13.

### 4. Police Reports

#### a. Detective Brimmer

According to the arrest report prepared by Detective Brimmer, he and Detective Beauchine

arrested Plaintiff at 12:00 a.m. on May 7, 2019. Dkt. No. 77-23. The arrest report listed Plaintiff

as 55 years old, 5'7" tall, 160 pounds, and described his apparent condition as "Appeared Normal." *Id.* The arrest report included criminal charges against Plaintiff. *Id.*

Detective Brimmer also prepared a police report regarding events on May 6 and 7, 2019, including his telephone conversation with Ms. Bailey. Dkt. No. 77-19. The parties dispute what was said during this conversation on May 7, 2019.

According to Detective Brimmer's report, Ms. Bailey corroborated certain key details of Plaintiff's confession during this conversation, including that the day before "she observed 2 unknown black males yelling at each other[;]" "one male punched the other, and the one that got punched was hitting the other with a stick[;]" and "one of the subjects went down to the ground unresponsive and the other male was saying something about his nephew[.]" *Id.* at 3. Detective Brimmer also wrote that Ms. Bailey stated that "she called 911 but walked away prior to EMS and Police arrival." *Id.*

According to a sworn affidavit provided by Ms. Bailey, she never said many of the statements Detective Brimmer attributed to her, including that she "never used the word 'punch' because I did not see either of the two individuals punching[;]" "never told Detective Brimmer that the man helping the victim was the who hit the victim. The person who hit the victim ran away. The victim was unresponsive and the older man told me the victim was his nephew. The older man asked me to call 911[;]" "never told Detective Brimmer that the older man was involved in this fight[;]" and "[t]he police arrived while I was on the phone with 911 and I spoke to a lady officer. I did not tell Detective Brimmer that I left before the police arrived." Dkt. No. 85-10 at ¶¶ 6-9. Ms. Bailey further stated that Detective Brimmer's report "contains false statements. I never told him that I witnessed anyone punching. I never told him that the older man who called the victim his nephew was involved in the fight. I never told him that I left before the police

21

arrived." *Id.* at ¶ 10.

### b. Officer Cecile

Officer Cecile's police report, dated May 6, 2019, listed Plaintiff as 55 years old, 5'7" tall, 160 pounds, and described his apparent condition as "Impaired Alcohol." Dkt. No. 77-6 at 2.

In the narrative portion of his report, Officer Cecile stated that "while in route, dispatch notes read that there was a fight in progress between two people with one person [ ] unconscious on the ground, the other person was wearing a green sweat suit and there is a very large stick involved." *Id.* at 5. With respect to Plaintiff's detention, Officer Cecile wrote "[b]ased on the notes from dispatch and lack of cooperation for Goldych and Adams, both were detained at this time." *Id.* As for his call with Ms. Bailey, Officer Cecile wrote:

> Bailey stated that she witnessed the fight between the victim and suspect . . . Bailey stated that the suspect was an old black male wearing a green jump suit. Bailey stated that she saw the male in the jump suit dodge a punch from the victim and then swing the large stick at [t]he victim's head which connected and knocked him to the ground.

*Id.* As for Plaintiff's appearance, Officer Cecile described him as "an older black male in a grayish/teal puffy jacket and green pants[.]" *Id.*

### c. Officer Tolone

Officer Tolone's police report, dated May 6, 2019, listed Plaintiff as 55 years old, provided no height or weight, and described his apparent condition as "Normal." Dkt. No. 77-8 at 4.

In the narrative portion of his report, Officer Tolone wrote that "[p]rior to our arrival dispatch advised us that our caller, Jordan Bailey who refused to speak with us regarding this incident, stated to the call taker that she saw two males fighting, one wearing a green jump suit, and then saw someone get struck with a stick and then saw the man on the ground." *Id.* at 2. With respect to Plaintiff's detention, Officer Tolone wrote that "Adams was detained at this time for

suspicion that he was in deed [sic] the suspect in this incident however, when we initially arrived on scene Adams stated there was another male that started a fight with Jones." *Id.*  As for Plaintiff's appearance, Officer Tolone wrote that "Adams, at the time contact was made, was wearing green pants and a grey / green vest." *Id.*

### d.  Other Police Reports

Officer Russell prepared a short report, also dated May 6, 2019, with a brief narrative that does not mention Ms. Bailey or Plaintiff, or Officer Russell's interactions with either of them. Dkt. No. 77-7 at 2.

Following Plaintiff's interrogation at CID, a non-party officer photographed Plaintiff in the interrogation room and collected his clothing early in the morning of May 7, 2019.  Dkt. No. 77-10.  This officer catalogued Plaintiff's clothing as consisting of a "Black winter coat[,]" "Grey pants with belt[,]" "Blue/green/white striped shirt[,]" "Blue Puma sneakers[,]" and a "Baseball Hat (Grey, green Bird Game logo)[.]" *Id.* at 3.

### 5.  Criminal Prosecution

In the weeks after the events of May 6, 2019, Officer Cecile, Detective Brimmer, and Ms. Bailey testified before a grand jury in Onondaga County.  Dkt. No. 77-25.  The grand jury subsequently indicted Plaintiff[10] for (i) assault in the first degree in violation of N.Y. Penal Law

---

[10] Members of the Onondaga County District Attorney's Office ("DA's Office") have since identified deficiencies with the process that led to this result.  Dkt. No. 85-7 at 1 ("'While it seems counterintuitive that someone would confess to something they did not do, it happens,' [Onondaga County District Attorney ("DA") William] Fitzpatrick said.  'And in this case, I hope all involved analyze the root causes of why this happened.  We have done that in my office.' . . . . 'I have discussed the case with the prosecutor initially assigned and pointed out mistakes that were made,' Fitzpatrick said.  'The prosecutor who presented it to the grand jury and missed several red flags is no longer with the office.'"); Dkt. No. 85-11 at 9 (Syracuse Police Department report stating that, according to Onondaga County Assistant District Attorney ("ADA") Joe Coolican, "when the grand jury proceeding occurred, there was no identification process done by the Assistant District

§ 120.10(1); (ii) assault in the second degree in violation of N.Y. Penal Law § 120.05(2); and (iii) criminal possession of a weapon in the third degree in violation of N.Y. Penal Law § 265.02(1). Dkt. No. 77-26 at 1. Plaintiff remained detained in jail pending trial. Dkt. No. 77-55 at ¶¶ 309, 382.

Mr. Jones died in the hospital on August 18, 2019. Dkt. No. 85-15. A medical examiner ruled Mr. Jones' death a homicide as a result of complications from being struck in the head "with a large stick containing imbedded nails." *Id.* at 1, 2. After Mr. Jones' death, it appears that the criminal charges against Plaintiff could have been increased from assault to manslaughter.[11] Dkt. No. 77-55 at ¶¶ 372-74.

On August 19 and 20, 2019, ADA Michael Manfredi offered Plaintiff, through his court-appointed counsel, "a plea to Manslaughter in the first with a sentence of 12 years Determinate." Dkt. No. 77-28 at 2, 1. On October 8, 2019, ADA Manfredi reiterated to Plaintiff's court-appointed counsel that the "[o]ffer remains Man 1st with 12 years determinate." *Id.* at 1.

On January 9, 2020, Plaintiff's court-appointed counsel made a bail application on behalf on Plaintiff, in part on the basis that:

> We have had an opportunity to review much of the evidence against [Plaintiff] and the defense believes there is significant evidence that the People have the wrong man in jail. Despite what the People have presented as a "confession", the defense believes that the evidence will show that it is a psychologically coerced false confession. There is no indication there are any witnesses identifying him at the scene. In fact the opposite. The People's case is weak.

Dkt. No. 77-39 at ¶ 22.

---

Attorney overseeing the case. Therefore, the witness [Ms. Bailey] was unaware Mr. Adams was the one who was in custody and accused of these crimes.").

[11] From the record before the Court, it is not clear whether these charges were ever increased. *Compare* Dkt. No. 77-33, *with* Dkt. No. 77-38.

Soon after, an investigator from the DA's Office contacted Ms. Bailey. Dkt. No. 77-34 at

1. On January 16, 2020, Ms. Bailey provided a voluntary affidavit that stated in relevant part:

> [Investigator Tim Galanaugh] asked if I would be willing to come down to his office and meet with Mr. Coolican, the prosecutor, and see if I would watch some video footage that they had. He also made me aware that the police had made an arrest of an individual the day of the [May 6, 2019] incident. I told him that I would be willing to come down and speak to them, and help in any way because I was unaware that the victim had died.
>
> Back in May, when everything had happened, I initially called 911 for a man that was trying to assist the victim. That man that I am speaking about was African American and told me that the victim was his nephew. I stayed on the scene with my siblings until the police officers arrived. I gave information to the 911 person telling them that the suspect that was responsible had run down James Street towards downtown. I told the dispatch person that the suspect was African American and over 6 foot tall and was wearing dark green. As the officers showed up they started talking to the older guy that was kneeling next to his nephew. They wanted him to step back from the victim. I told the female officer that he had nothing to do with it. There was a[ ]lot going on at the time and I didn't want to get more involved so I walked away with my siblings. At the time, I felt that I had cooperated enough by reporting it and I didn't want to involve myself or my siblings in what appeared to me at the time to be a fight between two guys that ended with one being knocked out with a stick. When the police officers contacted me 30 minutes or so later to see if I would come back to the scene to try to identify someone, I didn't want to get involved. I was scared that it would jeopardize my safety and my siblings['] safety so I told the police officers that I didn't want to do anymore than what I had done to help already.
>
> . . . .
>
> This is what I remember about the incident today: That I had been leaving Bryant and Stratton on James Street and observed two African American men that appeared to be about to fight. Me and my siblings w[]ere almost walking right through where this was occurring. The victim had a long branch in his hand and starts to run up on the suspect. As the victim tries to swing on the suspect, the suspect grabs the stick and snatches the stick from the victim. The suspect then swings the stick at the victim with one hand towards his upper body. I couldn't tell where it connected or if he followed up with an elbow. All I seen is the victim stumble and drop to the ground. Suspect then tosses the stick. The suspect then goes to the pa[]nts pocket of the victim, takes a cell phone out and smashes it onto the pavement. Then the suspect takes off running down the sidewalk on James Street towards downtown.
>
> I didn't see where the suspect had run to because I then focused my attention on the

victim on the ground. That's the same time when I noticed the older man get off the stones by the Chestnut Apartments sign and walk over to his nephew to check on him. I remember telling him that he should help get him up off the ground. The victim wasn't moving and looked like he had been knocked out, but after a few moments of looking at him more closely I told the older man that he, the victim, didn't look so good. That[']s when the uncle asked me to call 911, so I did. I stayed with the uncle until the police arrived, but like I said, I walked off shortly after with my siblings because we didn't want to get more involved.

Today, at around 1045 AM, I met Mr. Coolican and Investigator Galanaugh at the D.A.'s Office. They had me watch some video footage from one of the officer's body cameras when they showed up at the scene. In the video I saw the victim on the ground and the African American man, who told me the victim was his nephew, kneeling next to him wearing a gray baseball hat. You can hear me talking in the video telling the female officer that the victim was hit with the stick.

I showed Mr. Coolican w[here] the victim's cell phone can be seen in the video laying on the pavement, smashed. I was told by Mr. Coolican and Investigator Galanaugh that the person that was arrested in this incident, was the man that told me that the victim was his nephew. The person that the police arrested was not the suspect that I saw fighting with the victim, and causing the victim to be hurt with the stick. I saw that suspect run from the scene after smashing the victim's phone on the ground.

*Id.* at 1-2; *see also* Dkt. No. 77-55 at ¶¶ 380-81.

Plaintiff was not released from jail until February 12, 2020, more than nine months after his arrest on May 6, 2019. Dkt. No. 77-55 at ¶ 382. The charges against Plaintiff were not dismissed until September 15, 2020. *Id.* at ¶ 404.

### a. Plaintiff's Capacity

On February 13, 2020, the judge presiding over Plaintiff's criminal prosecution ordered Plaintiff's capacity evaluated pursuant to New York Criminal Procedure Law § 730. Dkt. No. 77-35 at 1 (stating that "the Court being of the opinion that the defendant may be an incapacitated person" an examination is ordered "to determine whether said defendant, as a result of mental disease or defect, lacks capacity to understand the proceedings against him or to assist in his own defense").

Two physicians subsequently examined Plaintiff and issued their reports on August 27, 2020.  Dkt. No. 77-55 at ¶¶ 391-92, 395.  As relevant here, the first physician concluded that "although suffering from Alcohol Use Disorder," Plaintiff "at the time of this evaluation, did not as a result of mental disease or defect lack the capacity to understand the proceedings against him or to assist in his own defense."  *Id.* at ¶ 394.  The second physician similarly concluded that Plaintiff "is not currently suffering from a mental illness which would cause him to lack the capacity to understand the proceedings against him or to assist his counsel in his own defense" and that Plaintiff, "at the time of this evaluation, did not as a result of mental disease o[r] defect lack the capacity to understand the proceedings against him or to assist in his own defense."  *Id.* at ¶ 398.

### 6.  Additional Investigation by CID

On January 29, 2020, prior to Plaintiff's release from jail, two non-party detectives returned to 941 James Street to obtain video footage of the incident that had occurred nearly nine months earlier.  *Id.* at ¶ 383.  Their investigation obtained no such footage, *id.* at ¶ 384, and determined that none of a dozen nearby businesses retained such footage for longer than three months, Dkt. No. 77-31 at 2.  The two detectives also made efforts at this time to locate individuals previously mentioned by Plaintiff and Ms. Goldych, including "the 'Pete' mentioned in BWC [footage from the Responding Officers], but without success."  Dkt. No. 77-55 at ¶¶ 385-86.

Forensic evidence recovered from items collected at 941 James Street—apparently including multiple drink containers as well as Mr. Jones' smashed phone—was linked to an individual whose first name is Pierre.  Dkt. No. 85-1 at ¶ 56; Dkt. No. 85-4; Dkt. No. 85-14 at 9, 28; Dkt. No. 85-11 at 28.  A non-party detective testified during his deposition that "[w]e do have forensic evidence indicating that he may have been present at the time of the incident or in the

hours preceding it." Dkt. No. 77-50 at 123:24-124:9.

A September 2020 internal memorandum from the Syracuse Police Department ("Memo") states that such evidence "strongly suggests, at a minimum, Pierre [ ] was onscene at some point that day [May 6, 2019], and drinking with the group" and notes that Pierre "is listed as much bigger than Adams ([ ] - 6'00'', 220 lbs.), and closer resembles that of the suspect description initially provided to 911 by Jordan Bailey." Dkt. No. 85-11 at 28. When provided with the opportunity to speak with CID, Pierre apparently declined to do so. *Id.* Another internal document from the Syracuse Police Department indicates that while Pierre had been identified as "a person of interest," "there is no proof beyond a reasonable doubt suggesting [Pierre] is the primary suspect at this time." *Id.* at 7-8. The Memo notes that the investigation of Mr. Jones' death "will now be considered 'unsolved'." *Id.* at 30.

### C. Prior Proceedings

#### 1. Citizen Review Board

In April 2021, Plaintiff filed a complaint with Defendant City's Citizen Review Board in connection with his arrest and interrogation. Dkt. No. 85-11 at 14-21. The Syracuse Police Department's Internal Affairs Division assigned a sergeant to investigate Plaintiff's complaint and prepare a case report. *Id.* at 1-13 ("Report"). The sergeant's investigation included an interview with a deputy police chief. *Id.* at 8-9. The sergeant included the following information from that conversation in the Report:

> I addressed the complaints made by Mr. Adams of the false arrest as well as being interviewed while intoxicated. Deputy Chief [ ] was able to explain there is case law which supports interviewing a person who is intoxicated. The only limitation to this is if the person being interviewed is intoxicated to the point of being in a manic state. Deputy Chief [ ] also informed me it is a matter of training that detectives are trained on the fact that interviewing an intoxicated person is lawful, unless in this manic state. . . . Therefore, the actions by [the D]etectives during that interview were lawful and proper.

*Id.* at 9.  The Report ultimately concluded that:

> Mr. Adams['] claim that he was arrested and charge[d] for a crime he did not commit is true.  However, after reviewing this case and based on the evidence shown, there is no evidence to show wrong doing on behalf of any of the Syracuse Police Officers involved.  The interview conducted by Det. Beauchine and then Det. Brimmer was lawful and proper.  There was no violation of any rules and regulations by Det. Beauchine or Det. Sgt. Brimmer, or any officer.  The basis for Mr. Adams being charged with this crime was due to his own admission and the lack of cooperation from the original eye witness.  Therefore, this complaint is unsubstantiated.

*Id.* at 12.

In the course of reaching these conclusions, the sergeant also briefly spoke with the Detectives.  *Id.* at 11-12.  According to Detective Brimmer, "Mr. Adams did not appear excessively intoxicated during the interview" that began on May 6, 2019.  *Id.* at 11.  Detective Beauchine similarly "stated [that] he did not feel Mr. Adams was excessively intoxicated" during the interview.  *Id.* at 12.  Detective Brimmer also shared that "Mr. Adams would not have been under arrest without the confession."  *Id.* at 11.

The sergeant, the sergeant's supervisor, a bureau chief, the first deputy chief, and the chief of police are all listed as March 2022 signatories to the Report.  *Id.* at 13.

### 2.  New York Court of Claims

Plaintiff previously filed a notice of claim in the New York Court of Claims.  Dkt. No. 63-1.  Defendants examined Plaintiff on January 22, 2021.  Dkt. No. 77-43.

### D.  Procedural History

Plaintiff commenced this action in June 2021.  Dkt. No. 1.  Defendants moved to dismiss the Complaint in July 2021.  Dkt. No. 7.  Plaintiff voluntarily dismissed his claims against one individual defendant and otherwise opposed the motion.  Dkt. Nos. 9, 16.

In March 2022, United States Senior District Judge Lawrence E. Kahn partially granted

and partially denied Defendants' motion to dismiss. Dkt. No. 19. Judge Kahn observed that "[i]f the facts alleged by Plaintiff are true, Plaintiff's detainment amounts to a substantial miscarriage of justice." *Id.* at 1. Judge Kahn dismissed Plaintiff's second, sixth, seventh, and ninth claims, as well as another individual defendant, and denied the balance of Defendants' motion. *Id.* at 1-18. Discovery proceeded, with the parties requesting and receiving numerous extensions. *See generally* Docket Sheet.

In January 2024, United States Magistrate Judge Mitchell J. Katz denied Plaintiff's motion to amend the Complaint to add two individual defendants, but granted Plaintiff's request to dismiss his claims against three other individual defendants. Dkt. No. 64.

The Motion was fully submitted in April 2025. Dkt. Nos. 77, 85, 90.

### E. Plaintiff's Claims

Plaintiff's remaining claims,[12] *see* Dkt. No. 19, are as follows: pursuant to Section 1983, (i) false arrest against the Individual Defendants, Dkt. No. 1 at ¶¶ 41-47; (ii) malicious prosecution against Defendants, *id.* at ¶¶ 63-71; (iii) fabricated evidence against Defendants, *id.* at ¶¶ 72-80; (iv) a *Monell* claim against Defendant City, *id.* at ¶¶ 52-62; and, pursuant to New York law, (v) false arrest against Defendants, *id.* at ¶¶ 91-93; and (vi) negligent supervision, etc., against Defendants, *id.* at ¶¶ 97-100.

## III.    STANDARD OF REVIEW

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*,

---

[12] The Complaint also contains various requests for relief. *See, e.g.,* Dkt. No. 1 at ¶¶ 105-114; Dkt. No. 77-56 at 9 n.2.

477 U.S. 317, 322-23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993). A court first determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Galeotti v. Cianbro Corp.*, No. 12-cv-00900, 2013 WL 3207312, at *4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

Defendant, in seeking summary judgment, "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia*, *Anderson*, 477 U.S. at 249-50).

## IV.    DISCUSSION

The Court addresses the parties' specific arguments with respect to the remaining claims below. Given the disputed factual record as to many aspects of Plaintiff's claims, the Court finds

it appropriate to reiterate the Second Circuit's guidance in another case involving Section 1983

claims for false arrest, malicious prosecution, fabricated evidence, and related *Monell* liability:

> We write because the district court improperly granted summary judgment to defendants. The record before us reveals evidence from which a jury could find that certain of the individual police officers prepared a false report and initiated a prosecution of plaintiff[] predicated on this manufactured evidence. We also write to emphasize a larger issue raised by this case. Plaintiff[] allege[s] that the defendant police officers lied and fabricated evidence. While we do not know whether the accusations can be sustained, we do know that such accusations must be carefully reviewed. Lying is wrong, and if the police lie while acting in their official capacity, they also violate the public trust. Courts must ensure that such serious accusations receive appropriate scrutiny lest our Court appears to endorse such official misconduct, which would weaken the public's respect for the administration of justice. In making these remarks, we emphasize that we have reached no conclusions about whether the plaintiff['s] accusations can be substantiated. It will be for a jury to determine at trial whether plaintiff[] ha[s] proved [his] very serious charges.

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 125 (2d Cir. 1997). While the Court addresses the

parties' significant factual disputes in detail below, it similarly reaches no conclusions at this stage

regarding whether Plaintiff will ultimately be able to prove his surviving claims.

### A. False Arrest under Section 1983 and New York law

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual

to be free from unreasonable seizures[,] is substantially the same as a claim for false arrest under

New York law." *Alexander v. City of Syracuse*, 132 F.4th 129, 156 (2d Cir. 2025) (alteration in

original) (quoting *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021)). And "[u]nder New

York law, to prevail on a claim for false arrest, a plaintiff must show that (1) the defendant intended

to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not

consent to the confinement, and (4) the confinement was not otherwise privileged." *Id.* (quoting

*Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021)). "Under both federal and New York

state law, probable cause is a complete defense to a false arrest claim." *Carruthers v. Colton*, ---

F.4th ---, 2025 WL 2405451, at *6 (2d Cir. Aug. 20, 2025) (quoting *Triolo v. Nassau Cnty.*, 24 F.4th 98, 106 (2d Cir. 2022)); *see also Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) ("[Plaintiff]'s unlawful arrest claim fails because his handcuffing was an 'investigatory detention' (otherwise known as a '*Terry* stop') that never ripened into an arrest and was supported by reasonable suspicion."). "Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Hawkins*, 37 F.4th 854, 858 (2d Cir. 2022) (quoting *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990)).

As detailed earlier, after several minutes of questioning by numerous officers, Plaintiff was handcuffed and put into the back of a police vehicle in front of 941 James Street at approximately 7:34 p.m. on May 6, 2019. *See supra* Section II.B.2. Plaintiff was eventually transported to CID shortly after 8:00 p.m., where he remained detained until his custodial interrogation began at approximately 10:30 p.m. *See supra* Section II.B.3. Plaintiff was held in the interrogation room until approximately 1:00 a.m. on May 7, 2019, when he was placed back in handcuffs and his booking process began. *Id.* Plaintiff was then detained for more than nine months, until his eventual release on February 12, 2020. *See supra* Section II.B.5.

Plaintiff's opposition to the Motion does not challenge his detention and questioning by officers prior to being handcuffed at approximately 7:34 p.m.[13] *See, e.g.,* Dkt. No. 85 at 10; *see also* Dkt. No. 77-56 at 12-13. And Defendants only seek summary judgment on the portions of

---

[13] To the extent that the Complaint states a claim for false arrest prior to this time, any such claim is dismissed as abandoned, as is any claim for declaratory judgment. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims."); *see also* Dkt. No. 1 at ¶¶ 101-04; Dkt. No. 77-56 at 9 n.2.

Plaintiff's false arrest claims that relate to his "pre-confession detainment" and "post-confession arrest," not his subsequent months-long detention.  *Compare* Dkt. No. 77-56 at 12, *with* Dkt. No. 1 at ¶¶ 43, 92-93; *see also* Dkt. No. 7-2 at 13-14; Dkt. No. 19 at 9-10.  The Court thus focuses its analysis on Plaintiff's detention at 941 James Street on May 6, 2019, his formal arrest at CID on May 7, 2019, and the five or so hours that he remained detained in between.

### 1.  Plaintiff's Detention at 941 James Street

Defendants first contend that Plaintiff's false arrest claims should fail because—although Plaintiff was handcuffed, placed in the back of a police vehicle, transported from his home to a police station approximately 30 minutes later, and detained for hours—he was not actually under arrest during this time.  Instead, Defendants argue, the approximately five-hour seizure of Plaintiff prior to his formal arrest merely constituted an investigative stop and only required reasonable suspicion.  Dkt. No. 77-56 at 13, 16 (stating that "only reasonable suspicion was required" to detain Plaintiff at 941 Adams Street and Defendants "had ample reasonable suspicion to detain Plaintiff"); *id.* at 17, 18 (stating that "Plaintiff's pre-confession detainment at CID was merely a continuation of his on-scene detainment" and "the detainment was supported by reasonable suspicion"); Dkt. No. 90 at 6 (stating that, as to Plaintiff's interrogation, "Defendants maintain that Plaintiff was being *detained* requiring only reasonable suspicion").

This is a particularly weak argument given applicable law and the facts of this case.[14]  *See, e.g., United States v. Lefebvre*, 117 F.4th 471, 475 (2d Cir. 2024) ("There were several factors present during th[is] seizure that, in many situations, this Court would consider to be evidence that

---

[14] It also contradicts a position that Defendants took in support of their prior dispositive motion, wherein they argued that Plaintiff's "alleged drunken confession – insofar as it could possibly be construed as 'false' – did not result in Plaintiff's loss of liberty as he had already been arrested and confined."  Dkt. No. 7-2 at 16.

a seizure had indeed become a de facto arrest. [Plaintiff]'s 'freedom of movement was restrained' and 'handcuffs were used.' . . . [T]he encounter lasted roughly 20 minutes. . . . [Plaintiff]'s transportation to a police station, instead of some of other reasonable third location, would in many situations clearly establish that the seizure had ripened into a de facto arrest.") (citations omitted) (collecting cases). The Court agrees with Plaintiff, Dkt. No. 85 at 8-9, that Defendants' maximalist position regarding their multi-hour detention of Plaintiff is unsupported by Fourth Amendment jurisprudence, *see, e.g., United States v. Candelario*, 486 F. App'x 907, 908 (2d Cir. 2012) ("It is well established that 'a police officer may *briefly detain* an individual for questioning if the officer has a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity.'") (emphasis added) (quoting *United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008)). *See also Grice*, 873 F.3d at 167 ("In general, to determine whether a *Terry* stop is so intrusive as to become an arrest, we look to: [']the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.[']") (quoting *United States v. Perea*, 986 F.2d 633, 645 (2d Cir. 1993)).

By approximately 7:34 p.m., Plaintiff had already been questioned for several minutes by multiple officers at the scene. *See supra* Section II.B.2.a.ii. Plaintiff had informed officers that he did not assault Mr. Jones (which Ms. Bailey had also said); that the person who assaulted Mr. Jones had run down James Street (which Ms. Bailey had said as well); that the assailant was a black man named "Pete" (which Ms. Goldych had also said); and that Plaintiff lived in one of the apartments at 941 James Street. *Id.* Defendants acknowledge that "the entire interaction was peaceful" prior to Plaintiff's handcuffing, Dkt. No. 77-56 at 15, and Officer Tolone testified that

he did not feel his safety was at issue, Dkt. No. 90-1 at ¶ 510. Throughout this time, Plaintiff did not interfere with the investigation, continued answering questions from officers, and made no effort to leave the scene. *See supra* Section II.B.2.a.ii. Indeed, BWC footage shows Plaintiff sitting down and speaking with Officer Russell seconds before Officer Tolone directed him to stand up and turn around. Dkt. No. 77-17 at 4:34. Officer Tolone then handcuffed Plaintiff and informed Plaintiff that he was being detained. *Id.* Officer Tolone proceeded to place Plaintiff into the back of one of the multiple police vehicles parked in front of Plaintiff's home. *Id.* at 5:08.

Given this factual record, a reasonable juror could conclude that Plaintiff was arrested at this time. *Grice*, 873 F.3d at 167. As the authority upon which Defendants rely, Dkt. No. 77-56 at 15, makes clear, "[h]andcuffing is ordinarily not incident to a *Terry* stop, and tends to show that a stop has ripened into an arrest," *Grice*, 873 F.3d at 167. *See also United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) ("Handcuffs are generally recognized as a hallmark of a formal arrest.") (collecting cases). Moreover, Defendants have failed to demonstrate the applicability of any of the "certain unusual circumstances" when "handcuffing a suspect to investigate a reasonable suspicion does not transform a *Terry* stop into an arrest." *Grice*, 873 F.3d at 168 (collecting cases); *see also* Dkt. No. 77-56 at 15-16. As just discussed, nothing in the record indicates concern about officer safety. The balance of Defendants' cursory arguments about why Plaintiff purportedly needed to be handcuffed and placed in the back of a police vehicle are unpersuasive. *United States v. Fiseku*, 915 F.3d 863, 870 (2d Cir. 2018) ("[T]o satisfy the reasonableness standard, officers conducting stops on less than probable cause must employ the least intrusive means reasonably available to effect their legitimate investigative purposes.") (quoting *Newton*, 369 F.3d at 674).

### 2.  Probable Cause

Defendants next argue that, regardless of when Plaintiff was arrested, they had probable cause to arrest him for assault[15] within moments of arriving at 941 James Street.  Dkt. No. 77-56 at 12-18.

This argument is also unconvincing, again given applicable law and the facts of this case. "To assess probable cause, a court considers only the facts 'available to the officer at the time of the arrest and immediately before it.'"  *Ashley*, 992 F.3d at 136 (quoting *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013)).  The parties largely agree on the basic information known to the Responding Officers at the time Plaintiff was handcuffed:[16] the 911 call notes, Plaintiff's presence at the scene, and some blood on Plaintiff's lip.  Dkt. No. 77-56 at 13-14; Dkt. No. 85 at 14-15. The parties dispute the factual contours of much of that information, however, as well as its legal significance.

Defendants' arguments regarding probable cause miss the forest for the trees.  When evaluating probable cause, the Second Circuit has "consistently held, as relevant here, that 'an officer may not disregard plainly exculpatory evidence.'"  *Washington v. Napolitano*, 29 F.4th 93,

---

[15] Defendants do not contend that they had probable cause to arrest Plaintiff for any other offense. Dkt. No. 77-56 at 14.

[16] The parties further agree that the "collective or imputed knowledge doctrine" applies.  *See, e.g.,* Dkt. No. 77-56 at 12 ("[T]he relevant inquiry is whether the collective knowledge of the Syracuse Police Department ('SPD') constituted probable cause, not whether a specific arresting officer had probable cause."); Dkt. No. 85 at 14.  Under that doctrine, an arrest "is permissible where the actual arresting . . . officer lacks the specific information to form the basis for probable cause . . . but sufficient information to justify the arrest . . . was known by other law enforcement officials initiating . . . the investigation" and "the other officers 'have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold.'"  *Brown v. City of New York*, 798 F.3d 94, 99 (2d Cir. 2015) (alterations in original) (first quoting *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007); and then quoting *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008)).

107 (2d Cir. 2022) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)).  Defendants were repeatedly informed that the black man who assaulted Mr. Jones was no longer present at the scene.  *See supra* Section II.B.2.a.  Ms. Bailey told the 911 dispatcher that this third man had assaulted the victim and had run off, but that the victim and his uncle were still there.  *Id.*  The 911 call notes indicated that the suspect was "last seen wearing" a green sweatsuit.  Dkt. No. 90-1 at ¶ 18.  Ms. Bailey again told Officer Russell—as Officer Russell stood next to Plaintiff, possibly within earshot of Officer Cecile as he approached—that the assailant who hit Mr. Jones was someone other than Plaintiff and had run off.  *See supra* Section II.B.2.a.  Plaintiff separately told Responding Officers that the assailant had run off, that his name was Pete, and that he was a black man.  *Id.*  Ms. Goldych also indicated that the man's name was Pete.  *Id.*  Defendants simply ignore the existence of this third man, identified by multiple eyewitnesses at the scene (and subsequently confirmed by forensic evidence).  *See* Dkt. No. 77-56 at 12-18; *see also* Dkt. No. 77-50 at 123:24-124:9; Dkt. No. 85-11 at 28.

Instead, Defendants argue that Plaintiff "was the only individual on scene that matched Ms. Bailey's description."  Dkt. No. 77-56 at 14.  But a reasonable juror could readily conclude that Plaintiff did not match Ms. Bailey's description.  As the parties agree, the 911 call notes described the assailant as 25 to 35 years old, 6'3" tall, with a "med[ium] build," and "black male."  Dkt. No. 90-1 at ¶ 18; Dkt. No. 77-4 at 3.  At the time, Plaintiff was 55 years old, 5'7" tall, and weighed approximately 160 pounds.  *See, e.g.,* Dkt. No. 90-1 at ¶ 515.  Defendants' own observations and descriptions of Plaintiff are consistent with these attributes.  *See, e.g.,* Dkt. No. 77-6 at 2 (Officer Cecile's police report listing Plaintiff's age as 55, height as 5'7," and weight as 160); Dkt. No. 77-23 (Detective Brimmer's arrest report listing the same); Dkt. No. 77-8 at 4 (Officer Tolone's police report listing Plaintiff's age as 55); Dkt. No. 77-16 at 4:11 (Officer

Russell's BWC footage showing her asking Plaintiff for his birthdate, prior to his arrest, and being told the date in 1964), 18:26 (Officer Russell's BWC footage showing her providing Plaintiff's birthdate to another officer); Dkt. No. 77-25 at 7:5-11 (Officer Cecile testifying that he thought Plaintiff was in his "[l]ate 50s or early 60s" "just going by looking at [him]").

The only portion of Plaintiff's physical attributes that "matched" Ms. Bailey's description of the suspect is that Plaintiff was also "a black male." Dkt. No. 90-1 at ¶ 18. A reasonable juror could conclude that this fails to provide reasonable suspicion to briefly detain Plaintiff, let alone probable cause to arrest him. *See, e.g., United States v. Walker*, 965 F.3d 180, 186 (2d Cir. 2020) ("As we have repeatedly said, 'race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop.'") (quoting *United States v. Swindle*, 407 F.3d 562, 569-70 (2d Cir. 2005)); *Zuniga-Perez v. Sessions*, 897 F.3d 114, 124 (2d Cir. 2018) ("As the Supreme Court has made abundantly clear, stopping and interrogating people based solely on race or ethnicity violates the Fourth Amendment.") (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885-86 (1975)); *Dancy v. McGinley*, 843 F.3d 93, 109 (2d Cir. 2016) ("[A] description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure.") (quoting *Brown v. City of Oneonta*, 221 F.3d 329, 334 (2d Cir. 2000)); *Jenkins*, 478 F.3d at 90 ("It has long been established, however, that when that description could have applied to any number of persons and does not single out the person arrested, probable cause does not exist.") (collecting cases); *see also supra* n.13.

Defendants also claim that Plaintiff's clothing "matched" the description Ms. Bailey had provided, in that "his hat, shirt, and pants all appeared to be different shades of green." Dkt. No. 77-56 at 13-14. This characterization is unsupported by the BWC footage from the Responding Officers, which a reasonable juror could conclude shows Plaintiff wearing a grey hat, a white

striped shirt, grey pants, and a puffy black patterned jacket, none matching. *See generally* Dkt. Nos. 77-15, 77-16, 77-17. Defendants' claim is also contradicted by the assessment from the non-party officer who cataloged Plaintiff's clothing as consisting of a "Baseball Hat (Grey, green Bird Game logo)[,]" "Blue/green/white striped shirt[,]" "Grey pants with belt[,]" and a "Black winter coat[.]" Dkt. No. 77-10 at 3. In any event, the varied articles of clothing Plaintiff wore on May 6, 2019 are not indisputably a "green sweatsuit," like Ms. Bailey had described. Dkt. No. 90-1 at ¶ 18. And Ms. Bailey never described the suspect wearing any hat at all, Dkt. No. 77-5, let alone a hat with prominent neon lettering, like the one Plaintiff had on his head when Officer Russell arrived, walked over to Plaintiff and Ms. Bailey, and began speaking with them, Dkt. No. 77-16 at 0:00. Given this factual record, Defendants have not established that Plaintiff's clothing "matched" the description of the suspect such that they are entitled to judgment as a matter of law.

At best, Defendants' argument is that they had probable cause to arrest Plaintiff because some of his clothing may have had some green. The Court finds this argument unpersuasive given the Second Circuit's analysis in *Dancy v. McGinley*. In that Section 1983 case, police officers received a description of a robbery suspect as simply "[t]hin black male, brown jacket." 843 F.3d at 99. Minutes later, officers stopped, and ultimately arrested, two teenagers near the crime scene, one of whom was wearing a "camouflage-patterned coat, with green, light green, and brown patches." *Id.* at 100, 101. As relevant here, the panel reasoned that there was not even reasonable suspicion to stop this teenager, who "was indeed thin, black, and male. But, unlike the description, he was wearing a camouflage-patterned coat." *Id.* at 109. The Circuit went on to explain that "[w]hile such a discrepancy does not necessarily defeat a finding of reasonable suspicion . . . the remaining description—thin, black, and male—is too vague in the circumstances here to justify a stop of anyone meeting it[.]" *Id.* (citations omitted) (collecting cases).

40

A reasonable juror could reach a similar conclusion here.  Plaintiff's age, height, and build were nothing like the physical description Defendants received for the suspect.  Further, Plaintiff's clothes, in color and type, did not constitute a "green sweatsuit," and thus did not provide Defendants reasonable suspicion to detain him, let alone probable cause to arrest him.  *See Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017) ("Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could find that the police arrested [plaintiff] based on little more than a witness's statement that he wore a similar shirt to that of one of [the victims'] attackers.  Although a jury could also interpret the evidence differently, the record presents genuine issues of material fact that preclude the conclusion that there was probable cause as a matter of law and that, instead, require a trial on the merits."); *see also supra* n.13.

Defendants' argument regarding Plaintiff's presence at the scene fares no better.  *See, e.g., United States v. Delossantos*, 536 F.3d 155, 160 n.4 (2d Cir. 2008) ("[A] person's presence at a crime scene or association with criminal suspects do not, without more, amount to probable cause to arrest."); *Dufort*, 874 F.3d at 350 ("Police do not have particularized probable cause to make an arrest simply because a suspect has suspicious acquaintances, or happens to be at the scene of a crime[.]") (citation omitted); *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) ("[A]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.") (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).  Plaintiff was present in front of the apartment building where he lived and, as detailed earlier, Defendants were repeatedly informed that the assailant was another man who had already left the scene.  *Mitchell v. City of New* York, 841 F.3d 72, 78 (2d Cir. 2016) ("[T]he failure to make a further inquiry when a reasonable person would

have done so may be evidence of lack of probable cause.") (quoting *Colon v. City of New York*, 455 N.E.2d 1248, 1250 (1983)).

As to the blood on Plaintiff's lip, in response to Officer Russell's question, Ms. Bailey can be heard explaining that "he was hit too in the whole altercation, you see that stick he was hit with that." Dkt. No. 77-55 at ¶ 12; *see also* Dkt. No. 77-16 at 0:05.

In sum, the totality of the circumstances proffered by Defendants fails to establish an undisputed factual record on which to grant summary judgment. *Delossantos*, 536 F.3d at 161. A reasonable juror could find that Defendants lacked probable cause to arrest Plaintiff at approximately 7:34 p.m. on May 6, 2019.

### 3. Subsequent Information

Defendants go on to argue that, between handcuffing Plaintiff and formally arresting him approximately five hours later, they obtained additional information that provided them probable cause to arrest Plaintiff. Dkt. No. 77-56 at 15-21. Because a reasonable juror could conclude that Plaintiff had been arrested at approximately 7:34 p.m., however, this subsequent information is not relevant to analyzing probable cause. *See, e.g., Carruthers*, --- F.4th ---, 2025 WL 2405451, at *6 ("To assess probable cause, a court considers only the facts 'available to the officer at the time of the arrest and immediately before it.'") (quoting *Ashley*, 992 F.3d at 136); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) ("The inquiry is limited to 'whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest.'") (quoting *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006)). Nonetheless, for the avoidance of doubt, a reasonable juror could conclude that none of the subsequent information

identified by Defendants, in combination with the earlier information discussed above, provided probable cause to formally arrest Plaintiff at approximately 1:00 a.m. on May 7, 2019.

### a. Plaintiff's Continued Detention Prior to His Interrogation

Defendants first argue that the Responding Officers "performed many investigative tasks" after handcuffing Plaintiff at approximately 7:34 p.m., and that Detective Brimmer "performed several investigative tasks" prior to interrogating Plaintiff at approximately 10:30 p.m. Dkt. No. 77-56 at 15, 17.

With respect to the Responding Officers, however, the only additional information Defendants identify is Officer Cecile's subsequent call with Ms. Bailey. *Id.* at 15-16. During that call, Ms. Bailey appears to have again stated that the man who hit Mr. Jones was "wearing a green jump suit," Dkt. No. 77-55 at ¶ 100, and was "like 35 to 40" years old, Dkt. No. 77-15 at 16:43, not the "[l]ate 50s or early 60s" that Officer Cecile perceived Plaintiff to be, Dkt. No. 77-25 at 7:5-11. Such information is largely consistent with—and duplicative of—the information Responding Officers already had. *See supra* Section IV.A.2. Thus, a reasonable juror could conclude that Plaintiff still did not match the description that Ms. Bailey provided.

Defendants further contend that the Responding Officers undertook various investigative efforts at 941 James Street after handcuffing Plaintiff. Dkt. No. 77-56 at 15-16. But Defendants identify no relevant additional information from these efforts. *Id.* Instead, Defendants take the position that the Responding Officers had "ample" probable cause to arrest Plaintiff because "[a]t the conclusion of th[eir] investigation, nothing excluded Plaintiff as the assailant. In other words, no eye-witness exonerated Plaintiff . . . and there was no available surveillance evidence." *Id.* at 16. Defendants cite no legal authority for the proposition that unless a person is "exonerated" by an eyewitness or video evidence at the scene of a crime, there is probable cause to arrest them. *Cf.*

*Ricciuti*, 124 F.3d at 130 ("This argument—an ill-conceived attempt to erect a legal barricade to shield police officials from liability—is built on the most fragile of foundations; it is based on an incorrect analysis of the law and at the same time betrays a grave misunderstanding of those responsibilities which the police must have toward the citizenry in an open and free society."). Defendants identify nothing from these investigative efforts that even suggested that Plaintiff had committed a crime. *Hawkins*, 37 F.4th at 858.

With respect to Detective Brimmer's investigation prior to Plaintiff's interrogation, Defendants similarly contend that Detective "Brimmer did not discover any evidence that suggested Plaintiff *was not* the assailant." Dkt. No. 77-56 at 17. More importantly, Defendants again fail to identify any additional information developed by Detective Brimmer that indicated Plaintiff *was* the assailant. *Id.* Moreover, a reasonable juror could conclude that the factual record belies Defendants' claim. The results of the canvas conducted by Detective Brimmer and his colleague further indicated that there had been three men drinking at the scene of the assault, not just Plaintiff and Mr. Jones, and thus further supported the possibility that Plaintiff was not the assailant. Dkt. No. 77-13 at 2; *see also* Dkt. No. 77-56 at 12.

### b. Plaintiff's Interrogation

Defendants next argue that Plaintiff's statements during his interrogation by the Detectives provided probable cause for his arrest, and that "Plaintiff voluntarily waived his rights and was not coerced into a confession." Dkt. No. 77-56 at 18-21.[17]

"Challenges to the voluntariness of a confession are based on two overlapping constitutional provisions: (1) due process protections under the Fifth (or Fourteenth) Amendment,

---

[17] Defendants do not dispute that *Miranda* warnings were necessary. *See id.*; *Jackson v. Conway*, 763 F.3d 115, 136 (2d Cir. 2014) ("The *Miranda* safeguards apply only to 'custodial interrogations.'").

and (2) the Fifth Amendment privilege against self-incrimination." *United States v. Mendonca*, 88 F.4th 144, 163 (2d Cir. 2023) (citing *Dickerson v. United States*, 530 U.S. 428, 433 (2000)). "As a general matter, courts' descriptions of statements as 'compelled' (invoking the text of the Self-Incrimination Clause) and/or 'involuntary' (invoking, arguably, the Due Process Clause) are often used interchangeably and the words often treated synonymously." *United States v. Allen*, 864 F.3d 63, 82 n.84 (2d Cir. 2017) (collecting cases). As a practical matter, courts "look at the totality of circumstances surrounding a *Miranda* waiver and any subsequent statements to determine knowledge and voluntariness." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (citation omitted). "To be effective, a waiver of a defendant's *Miranda* rights must be both knowing and voluntary." *United States v. LaPorte*, 779 F. App'x 63, 65 (2d Cir. 2019) (citing *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011)). In the *Miranda* context, "'knowing' means with full awareness of the nature of the right being abandoned and the consequences of abandoning it, and 'voluntary' means by deliberate choice free from intimidation, coercion, or deception." *Taylor*, 745 F.3d at 23 (quoting *Plugh*, 648 F.3d at 127). Even if a waiver is knowing and voluntary, courts "must nonetheless determine whether the [subsequent] inculpatory statements themselves were voluntary." *Id.* (citing *Dickerson*, 530 U.S. at 444).

Defendants make various factual arguments as to why "there is no evidence that Plaintiff was not of sound mind or so intoxicated as to render his confession involuntary." Dkt. No. 77-56 at 19-20. Given the present factual record, however, Defendants are not entitled to summary judgment on this issue.

As an initial matter, Defendants' own expert contradicts Defendants' position. *Id.* at 20. Dr. Weisman has repeatedly opined that, over the course of the interrogation, "Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of

alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him." Dkt. No. 77-52 at 11-13.

Further, the parties agree that Plaintiff consumed in excess of one hundred ounces of malt liquor in the hours before his interrogation. Dkt. No. 77-55 at ¶¶ 410-11, 414, 420. Plaintiff stated "I'm drunk" shortly after the interrogation began, Dkt. No. 77-22 at 6:22, and repeatedly referenced his drunkenness thereafter, Dkt. No. 90-1 at ¶ 522. Nearly three hours after the interrogation began, Plaintiff's BAC, as measured by Defendants, was still almost twice the legal limit. Dkt. No. 77-24; *see also supra* n.4. Dr. Weisman opined that, even at this lower BAC, "[m]otor function, speech, and judgment are all severely affected" and that "[s]taggering, and slurred speech, may be observed." Dkt. No. 77-52 at 10. A reasonable juror could conclude that Plaintiff's body movements, speech, and demeanor during the videotaped interrogation demonstrate a significant level of intoxication, and also that they are consistent with Dr. Weisman's opinion. *See generally* Dkt. No. 77-21.

Defendants' suggestion that Plaintiff's mental health during the interrogation was not at issue because he did not share any hallucinations with the Detectives proves too much. Dkt. No. 77-56 at 20 ("[A]t no point during the interview did Plaintiff indicate that he was hearing voices. . . . Similarly, at no point during the interview did Plaintiff indicate that he could see things that the Defendant Detectives could not see."). Plaintiff's medical diagnoses at the time included schizophrenia, depression, and alcoholism. Dkt. No. 77-42 at 2-3; Dkt. No. 77-55 at ¶ 454. During the interrogation, Plaintiff explained that he was not currently working because he had a dual diagnosis and that his primary care doctor, psychiatrist, and counselor were at the same local healthcare provider. Dkt. No. 77-22 at 102:16-103:16. As for Defendants' argument that Plaintiff

was determined not to be incapacitated more than a year after the interrogation, that does little to establish the voluntariness of Plaintiff's waiver on May 6, 2019.  Dkt. No. 77-55 at ¶¶ 390-98.

Given this record, a reasonable juror could determine that Plaintiff's *Miranda* waiver was not voluntary.

Even if Defendants had established that Plaintiff's waiver was voluntary, they have not demonstrated that it was also knowing.  *LaPorte*, 779 F. App'x at 65.  Defendants do not appear to make any express arguments on this second requirement for waiver.  *See, e.g.,* Dkt. No. 77-56 at 18 ("[A]s discussed below, Plaintiff voluntarily waived his rights and was not coerced into a confession."); *id.* at 25 ("[F]or the reasons stated above, Plaintiff voluntarily waived his *Miranda* rights and his confession was freely given.").  In any event, Dr. Weisman's opinions also include his assessment that—when sober—Plaintiff's "basic understanding of *Miranda*" ranks in the eighteenth percentile of pretrial defendants and that Plaintiff "has deficits in his *Miranda* understanding, particularly regarding legally acceptable deceptive police practices as well as other specific aspects of remaining silent versus talking to the police."  Dkt. No. 77-52 at 7, 8-9.  Because "knowing" for purposes of *Miranda* means "made *with a full awareness of both the nature of the right being abandoned* and the consequences of the decision to abandon it," a reasonable juror could find that Plaintiff's waiver was not knowing.  *United States v. O'Brien*, 926 F.3d 57, 73 (2d Cir. 2019) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010)).

A reasonable juror could also find Plaintiff's subsequent confession, after extensive interrogation by the Detectives, involuntary for similar reasons.  *See, e.g., Taylor*, 745 F.3d at 24 ("An individual's mental state should be considered in the voluntariness inquiry to the extent it allowed law enforcement to coerce the individual. . . .  It is clear, however, that when 'a person is unconscious or drugged or otherwise lacks capacity for conscious choice,' a confession cannot be

voluntary.") (first citing *Colorado v. Connelly*, 479 U.S. 157, 164-65 (1986); then citing *United States v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1998) (*per curiam*); and then quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973)).  Again, Defendants' expert has repeatedly opined that, during the interrogation, "Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him."  Dkt. No. 77-52 at 11-13.  The Court also notes that, prior to Plaintiff's confession, the Detectives removed Plaintiff's phone from his person and then from the room.  Dkt. No. 77-22 at 27:6-20, 60:24-61:3.  During the subsequent break, and prior to Plaintiff's confession, Plaintiff is visible in the video talking to himself and trying to open the locked door keeping him in the interrogation room.  Dkt. No. 77-21b at 14:00-17:00; *cf. Poventud v. City of New York*, 750 F.3d 121, 145 & n.6 (2d Cir. 2014) (Lynch. J., concurring) ("[W]e know that false confessions have been obtained by pressures much less imposing than those to which [plaintiff] was subjected.") (collecting authorities).

Because a reasonable juror could determine that Plaintiff's confession was involuntary, based in part on his intoxication, capacity, and the length and nature of his detention and interrogation, the Court finds Defendants' argument that the Detectives permissibly used "falsehoods" during the interrogation to be somewhat beside the point.  Dkt. No. 90 at 7 (citing *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) ("The fact that the police misrepresented statements that [a witness] had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible.")); *see also United States v. Caraballo*, 282 F. App'x 910, 914 (2d Cir. 2008) ("We have held that '[w]hether a confession is a product of coercion may only be determined after a careful evaluation of the totality of all the surrounding circumstances, including

the accused's characteristics, the conditions of the interrogation, and the conduct of law enforcement officials.'") (alteration in original) (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)).

For all of these reasons,[18] the Motion is denied as to Plaintiff's federal and state claims for false arrest following his handcuffing at approximately 7:34 p.m. on May 6, 2019.

### B. Malicious Prosecution under Section 1983

"To prevail on a malicious prosecution claim under New York law, a plaintiff must show '(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding[,] and (4) actual malice.'" *Alexander*, 132 F.4th at 158 (alteration in original) (quoting *Kee*, 12 F.4th at 161-62). Section 1983 requires these same four elements, "but it also imposes an additional one: '(5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.'" *Id.* (first quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000); and then citing *Chiaverini v. City of Napoleon*, 602 U.S. 556, 562 (2024)).

Defendants challenge only the probable cause element of Plaintiff's Section 1983 claim for malicious prosecution. Defendants argue that this claim fails because (i) "the probable cause supporting Plaintiff's arrest was overwhelming;" (ii) "[t]hat probable cause only increased in the

---

[18] Defendants' argument that no Individual Defendants was personally involved in all of the events resulting in Plaintiff's arrest and monthslong detention is unpersuasive. Dkt. No. 77-56 at 13, 21 n.6. As detailed above, Plaintiff has sufficiently established the personal involvement of every Individual Defendant in the events giving rise to his false arrest claims. *See, e.g., Legree v. City of Waterbury*, No. 22-cv-00659, 2024 WL 3964944, at *7 (D. Conn. Aug. 28, 2024) ("However, 'personal involvement' in an arrest is not limited to officers who were physically involved in taking someone into custody. Courts in this Circuit have upheld false arrest liability for non-arresting officers.") (collecting cases).

day following Plaintiff's arrest;" and (iii) the DA's Office sought and obtained Plaintiff's indictment. Dkt. No. 77-56 at 21-24.

Defendants' first argument is unpersuasive for the reasons detailed previously. *See supra* Section IV.A. Given the current record, a reasonable juror could find that Defendants did not have probable cause to either arrest or prosecute Plaintiff based on the events that transpired between approximately 7:30 p.m. on May 6, 2019, and 1:00 a.m. on May 7, 2019. *See, e.g., Walsh v. City of New York*, 742 F. App'x 557, 562 (2d Cir. 2018) ("'Probable cause, in the context of a malicious prosecution, has . . . been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty.' . . . Because a reasonable juror could believe that probable cause did not exist for [plaintiff]'s arrest, as noted above, we conclude that it follows that a reasonable juror could also believe that probable cause did not exist for [plaintiff]'s prosecution.") (first alteration in original) (citing *Stansbury*, 721 F.3d at 95). Summary judgment is thus not appropriate on this ground.

Defendants' second argument relies on disputed facts that are also not appropriately resolved at summary judgment. Defendants contend that, later on May 7, 2019, Detective Brimmer received additional information from Ms. Bailey and Ms. Goldych. Dkt. No. 77-56 at 22-23. But, as detailed earlier, the parties dispute what Ms. Bailey actually said to Detective Brimmer. *See supra* Section II.B.4.a. Moreover, Ms. Bailey's sworn statement suggests that she provided significant exculpatory information to Detective Brimmer. *See, e.g.,* Dkt. No. 85-10 at ¶¶ 7-8, 10; *Napolitano*, 29 F.4th at 107 ("[W]e have also consistently held, as relevant here, that 'an officer may not disregard plainly exculpatory evidence.'") (quoting *Panetta*, 460 F.3d at 395). Because there is a genuine dispute of material fact as to what information Ms. Bailey provided Detective Brimmer—including whether it was exculpatory—such information is not an

appropriate basis on which to find the existence of probable cause as a matter of law.  Nor is the information that Ms. Goldych apparently provided Detective Brimmer on May 7, 2019, during his third attempt to speak with her.  Dkt. No. 77-19 at 2-3.  Given Ms. Goldych's intoxication, memory, and the absence of a written statement from her, the information attributed to her does not establish probable cause entitling Defendants to judgment as a matter of law.  *See supra* n.7.

Defendants' third argument rests on the presumption of probable cause created by a grand jury indictment.  *See, e.g., Werkheiser v. Cnty. of Broome*, 655 F. Supp. 3d 88, 103 (N.D.N.Y. 2023) ("[I]ndictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.") (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)).  The parties agree that such a presumption applies in this case, but dispute whether the factual record rebuts it.  Dkt. No. 77-56 at 23; Dkt. No. 85 at 28-29.

A reasonable juror could conclude that the current factual record rebuts such a presumption.  Not only was the prosecution against Plaintiff dismissed, senior prosecutors in the DA's Office have indicated that the basis for the prosecution was deeply flawed.  Dkt. No. 85-7 at 1; Dkt. No. 85-11 at 9.  A reasonable juror could find, for example, that Plaintiff's prosecution was initiated by (i) the arrest report charging Plaintiff that Detective Brimmer prepared; (ii) the allegedly false confession obtained by Detectives Brimmer and Beauchine, *see, e.g., Ekukpe v. Santiago*, 823 F. App'x 25, 32 (2d Cir. 2020) ("A jury 'may permissibly find that a defendant initiated a prosecution where he filed the charges or prepared an alleged false confession and forwarded it to prosecutors.'") (quoting *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010)); *Dufort*, 874 F.3d at 353 ("The 'initiation' requirement is met when the plaintiff can establish that police officers forwarded statements to a prosecutor without sharing that the

statements were suspect.") (citing *Manganiello*, 612 F.3d at 163)); and/or (iii) the purportedly false statements in the police reports prepared by Detective Brimmer, Officer Cecile, Officer Tolone, and Officer Russell,[19] *see, e.g., Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) ("[G]enerally in malicious prosecution actions alleging that a police officer provided false information to a prosecutor, what prosecutors do subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior.") (collecting cases); *Werkheiser*, 655 F. Supp. 3d at 103 ("A defendant could have initiated a prosecution 'by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor.'") (first quoting *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 605 (E.D.N.Y. 2017); additional citations omitted).

Moreover, Plaintiff is correct that a "jury examining Detective Brimmer's police report alongside Ms. Bailey's statements could conclude that Det. Brimmer fabricated what [Ms.] Bailey told him to support, rather than contradict, Mr. Adams' false confession." Dkt. No. 85 at 27; *see also Manganiello*, 612 F.3d at 162 ("Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.'") (quoting *Ricciuti*, 124 F.3d at 130); N.Y. Crim. Proc. Law § 60.50 ("A person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed."); N.Y. Crim. Proc. Law § 70.10(1) ("[E]vidence is not legally sufficient when corroboration required by law is absent.").

---

[19] Each report was affirmed under penalty of perjury. *See, e.g.,* Dkt. No. 77-19 at 2-3; Dkt. No. 77-6 at 5; Dkt. No. 77-8 at 2; Dkt. No. 77-7 at 2.

The Court also agrees with Plaintiff that a reasonable juror could conclude that the police reports from the Responding Officers contained "false or misleading information that wrongfully inculpated Mr. Adams and failed to include key exculpatory information." Dkt. No. 85 at 28; *see also Manganiello*, 612 F.3d at 162 ("Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of probable cause created by the indictment may be overcome.") (quoting *Boyd v. City of New York*, 336 F.3d 72, 77 (2d Cir. 2003)); *Werkhesier*, 655 F. Supp. 3d at 104 ("Alternatively, the presumption 'can be overcome by a showing by claimant that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures.") (quoting *Hill v. Melvin*, No. 05-cv-6645, 2006 WL 1749520, at *13 (S.D.N.Y. June 27, 2006)).

For instance, Officer Cecile's report states that Ms. "Bailey stated that the suspect was an old black man." Dkt. No. 77-6 at 5. But this assertion is contrary to the actual description of the suspect contained in the 911 call notes, Dkt. No. 90-1 at ¶ 18 (indicating that Ms. Bailey stated the suspect was only 25 to 35 years old) and the similar description Ms. Bailey appears to have provided to Officer Cecile during their subsequent phone conversation, Dkt. No. 77-15 at 16:43 (Officer Cecile clarifying "the guy who got knocked out was, like, in his mid to late 20s, and it was, like, an older guy, like 35 to 40, that hit him?"). Officer Cecile also noted in his report that the suspect had been described as wearing "a green sweat suit," while Plaintiff was wearing "a grayish/teal puffy jacket and green pants[.]" Dkt. No. 77-6 at 5. As detailed earlier, while there is presently a factual dispute as to whether Plaintiff's pants were green, Defendants do not contend that Plaintiff's jacket was green. *See supra* Section IV.A.2 (Defendants arguing that Plaintiff's

"hat, shirt and pants all appeared to be different shades of green") (quoting Dkt. No. 77-56 at 14); *see also* Dkt. No. 77-10 at 3 (report from non-party officer stating that Plaintiff had a "Black winter coat"). Similarly, Officer Tolone's report states that the suspect was wearing "a green jump suit," while Plaintiff "was wearing green pants and a grey / green vest." Dkt. No. 77-8 at 2. As also detailed earlier, Defendants do not contend that Plaintiff was wearing a vest at all. *See supra* Section IV.A.2; *see also* Dkt. No. 77-10 (report from non-party officer listing Plaintiff's items of clothing, none of which are a vest). Given all this, a reasonable juror could find that Officers Cecile and Tolone fabricated portions of their reports to align their descriptions of Plaintiff with that of the suspect.

Additionally, Officers Cecile and Russell omitted any mention of the exculpatory facts that Ms. Bailey,[20] Ms. Goldych, and Plaintiff all indicated that a third man had assaulted Mr. Jones and left the scene. Dkt. Nos. 77-6, 77-7; *see also Werkheiser*, 655 F. Supp. 3d at 103; *Napolitano*, 29 F.4th at 107. For his part, Officer Tolone's report states only that "when we initially arrived on scene Adams stated there was another male that started a fight with Jones." Dkt. No. 77-8 at 2.

With respect to each Individual Defendant, then, a reasonable juror could find that the indictment "was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith,'" or "that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper

---

[20] Defendants contend that Officer Russell was "unaware of the fact" that Ms. Bailey was still on the scene when Officer Russell arrived. Dkt. No. 77-56 at 14. This assertion is contradicted by Officer Russell's BWC footage. *See* Dkt. No. 77-16 at 0:01 (Officer Russell responding to Ms. Bailey's statement that "he got into a fight with somebody, the other dude ran off, but he got knocked out" with "the other dude knocked out?"); *id.* at 11:27 (Officer Russell stating "I wish we would have got those people that were . . ." and gesturing towards the sidewalk in the direction Ms. Bailey and her siblings had walked); *id.* at 17:21 (Officer Russell stating "did anyone contact those people back," presumably again in reference to Ms. Bailey and her siblings).

procedures," *Werkheiser*, 655 F. Supp. 3d at 104 (first quoting *Savino*, 331 F.3d at 72; and then quoting *Hill*, 2006 WL 1749520, at *13).  Given the current factual record, a reasonable juror could find that the presumption of probable cause is rebutted.  *Hicks v. Marchman*, 719 F. App'x 61, 65 (2d Cir. 2018) ("[T]he presumption can be rebutted by showing 'that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith[.]'") (second alteration in original) (quoting *Colon*, 455 N.E.2d at 1250-51).  Accordingly, the Court denies the Motion as to Plaintiff's Section 1983 claim for malicious prosecution against the Individual Defendants.[21]

### C.  Fabricated Evidence under Section 1983

In order to prevail on "a Section 1983 fabrication of evidence claim, a plaintiff must demonstrate that '(1) [an] investigating official (2) fabricat[ed] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result." *Ortiz v. Stambach*, 137 F.4th 48, 67 (2d Cir. 2025) (alterations in original) (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016)).

Defendants first argue that Plaintiff's fabricated evidence claim is limited to his allegedly false confession and should thus be dismissed against the Responding Officers, "who were not present for Plaintiff's interview and were not involved in his confession."  Dkt. No. 77-56 at 25, Dkt. No. 90 at 8.  The Court agrees with Plaintiff that this claim is not so limited, and that "there

---

[21] To the extent that the Complaint states a distinct claim for malicious prosecution against Defendant City individually, or pursuant to New York law, any such clam is dismissed as abandoned.  *Compare* Dkt. No. 77-56 at 22 & n.7, 24, *with* Dkt. No. 85 at 23-30; *see also Jackson*, 766 F.3d at 195.  Plaintiff's separate *Monell* claim against Defendant City is addressed further below.  *See infra* Section IV.D.

are disputed issues of fact from which a reasonable juror could find that" each of the Responding Officers "fabricated inculpatory evidence [or] suppressed exculpatory evidence to implicate [Plaintiff] wrongly."  Dkt. No. 85 at 30; *see also supra* Section IV.B.

As to the confession, Defendants' renewed argument that Plaintiff voluntarily waived his *Miranda* rights and voluntarily confessed remains unpersuasive for the reasons previously set forth.  Dkt. No. 77-56 at 25; *see also supra* Section IV.A.3.b.

Defendants' final argument that the Detectives did not know Plaintiff's confession was false is similarly insufficient to grant summary judgment on this claim.  Dkt. No. 77-56 at 25-26. A reasonable juror could view the videotaped interrogation of Plaintiff and conclude that the Detectives knew Plaintiff's eventual confession was false because, for example, Plaintiff was visibly intoxicated; Plaintiff denied assaulting Mr. Jones nearly 200 times, Dkt. No. 85-2 at ¶ 570; Plaintiff "became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him," as Defendants' expert opined after viewing the videotaped interrogation, Dkt. No. 77-52 at 11-13; or, as Detective Brimmer noted in his police report, because Plaintiff "provided several different versions about what occurred," Dkt. No. 77-19 at 2, some of which were implausible, *see, e.g.,* Dkt. No. 77-22 at 86:22-87:22 (Plaintiff stating that he was able to hit Mr. Jones in the head three of four times with a stick before Mr. Jones fell down); *id.* at 100:8-21 (Plaintiff stating that Mr. Jones punched him twice over the course of the day, both times on the "same place" on his lip and Detective Brimmer responding "[y]eah, he knows where to get you, man.  He's got aim on that thing, huh").  *See also Ortiz*, 137 F.4th at 62, 67-68 ("[T]he law does not require a plaintiff to prove that police officers fabricated evidence or engaged in bad faith through any particular type of evidence and, thus, a plaintiff may do so entirely through circumstantial evidence. . . . 'The jury, of course, was not required to believe [the

defendant's] testimony denying knowledge.  Issues relating to state of mind, such as knowledge and intent, may be influenced by assessments of credibility and often must be established by circumstantial evidence.'") (last alteration in original) (quoting *United States v. Ocampo-Guarin*, 968 F.2d 1406, 1410 (1st Cir. 1992)).  Moreover, if a jury were to believe Ms. Bailey that Detective Brimmer fabricated various statements he attributed to her in his police report, they could also conclude that he did so knowingly.

Accordingly, the Court denies the Motion as to Plaintiff's Section 1983 claim for fabricated evidence against the Individual Defendants.[22]

### D.  *Monell* Claim

Section 1983 "does not impose vicarious liability on a municipality for the actions of its employees."  *Alexander*, 132 F.4th at 160 (citing *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023)).  Instead, "[t]o hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (second alteration in original) (first quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007); and then citing *Monell v. Dep't. of Soc. Servs. of the City of New York*, 436 U.S. 658, 690-91 (1978)).  As to the first element, a plaintiff can establish the existence of an official policy or custom in four ways:

> (1) a formal policy endorsed by the municipality, . . . ; (2) actions directed by the government's "authorized decisionmakers" or "those who establish governmental policy," . . . ; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware, . . . ; or (4) a "constitutional violation[ ] resulting from [policymakers'] failure to train municipal employees[.]"

---

[22] To the extent that the Complaint states a distinct claim for fabricated evidence against Defendant City individually, any such clam is dismissed as abandoned.  *Compare* Dkt. No. 77-56 at 26, *with* Dkt. No. 85 at 30; *see also Jackson*, 766 F.3d at 195.  Plaintiff's separate *Monell* claim against Defendant City is addressed next.  *See infra* Section IV.D.

*Deferio v. City of Syracuse*, 770 F. App'x 587, 589-90 (2d Cir. 2019) (final alteration added) (first citing *Turpin v. Mailet*, 619 F.2d 196, 199 (2d Cir. 1980); then quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); then citing *Turpin*, 619 F.2d at 199; and then quoting *City of Canton v. Harris*, 489 U.S. 378, 380 (1989)).

Defendants first argue that Plaintiff's *Monell* claim should be dismissed because there is no underlying constitutional violation. Dkt. No. 77-56 at 26. Given that Plaintiff's constitutional claims survive summary judgment, this argument is unavailing. *See supra* Section IV.A-C.

Defendants next argue that the purportedly similar arrests referenced in one paragraph of the Complaint do not establish a *Monell* claim. Dkt. No. 77-56 at 27-28. Those alleged instances appear to relate to excessive force and racial profiling claims against non-party officers in the Syracuse Police Department over a span of some years. Dkt. No. 1 at ¶ 61. In part because Plaintiff has not brought an excessive force claim, the Court agrees with Defendants that these alleged instances are insufficiently similar to the constitutional deprivations Plaintiff allegedly suffered. *See Campo v. City of New York*, No. 19-cv-04364, 2022 WL 970730, at *12 (E.D.N.Y. Mar. 31, 2022) ("A plaintiff may also plead the existence of *de facto* customs or policies 'by citing to complaints in other cases that contain similar allegations.'") (quoting *Gaston v. Ruiz*, No. 17-cv-1252, 2018 WL 3336448, at *6 (E.D.N.Y. July 6, 2018)). As Defendants correctly point out in reply, Plaintiff also has not opposed the Motion on this narrow issue. Dkt. No. 90 at 8-9; *see also Jackson*, 766 F.3d at 195. Accordingly, any *Monell* claim based on these dissimilar cases or racial profiling is dismissed.

For whatever reason, Defendants do not squarely address the core of Plaintiff's *Monell* claim. *Compare* Dkt. Nos. 77-56, 90, *with* Dkt. No. 1 at ¶¶ 52-60 (alleging, *inter alia*, that Defendant City "has a policy, custom, practice and pattern of conduct in place that enables its

agents and employee[ ] police officers to act with deliberate indifference to the constitutional rights

of individuals[,]" including "inadequate guidelines for conducting interrogations, obtaining false

confessions and corroborating false confessions with eye witness accounts").    Plaintiff's

opposition to the Motion argues that Defendant City was deliberately indifferent to his

constitutional rights by failing "to supervise and/or train its officers to undertake constitutionally

lawful detentions, interrogations, and practices to forego the fabrication of evidence." Dkt. No. 85

at 31-33 (citing Dkt. No. 1 ¶¶ 53, 54, 58).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim

turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Oklahoma City*

*v. Tuttle*, 471 U.S. 808, 822-23 (1985) (plurality opinion)).   The Second Circuit has set forth the

following requirements before a municipality's failure to train or supervise constitutes deliberate

indifference:

> "First, the plaintiff must show that a policymaker knows 'to a moral certainty' that
> her employees will confront a given situation." . . . "Second, the plaintiff must show
> that the situation either presents the employee with a difficult choice of the sort that
> training or supervision will make less difficult or that there is a history of employees
> mishandling the situation." . . . "Finally, the plaintiff must show that the wrong
> choice by the city employee will frequently cause the deprivation of a citizen's
> constitutional rights." . . . "In addition, at the summary judgment stage, plaintiffs
> must 'identify a specific deficiency in the city's training program and establish that
> that deficiency is closely related to the ultimate injury, such that it actually caused
> the constitutional deprivation.'"

*Jenkins*, 478 F.3d at 94 (first quoting *Walker v. City of New York*, 974 F.2d 293, 297, 298 (2d Cir.

1992); and then quoting *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006)).

Regardless of whether Plaintiff has satisfied the first three of these requirements, his

assertions with respect to the Responding Officers' training lack the necessary factual detail and

are too conclusory.  Dkt. No. 85 at 31.  He fails to identify any "specific deficiency in the city's

training program and establish that that deficiency is closely related to the ultimate injury[,]"

*Green*, 465 F.3d at 81.  Accordingly, any *Monell* claim based on the training of the Responding Officers is dismissed.  For similar reasons, any *Monell* claim based on training related to fabricated evidence generally is also dismissed.

Plaintiff's arguments as to the training the Detectives received warrant a different outcome however.  Plaintiff contends that the Detectives received inadequate "training on how to avoid false confessions" and "improperly interrogated" Plaintiff, leading to his allegedly false confession.  Dkt. No. 85 at 33.  Unlike with the Responding Officers and fabricated evidence more generally, Plaintiff also sets forth various facts regarding the Detectives' interrogation training, facts which Defendants largely do not deny.  Dkt. No. 90-1 at ¶¶ 523-28, 531-33, 587-88.

Additionally, the Report that Plaintiff includes in his opposition to the Motion states that a deputy police chief at the Syracuse Police Department "was able to explain there is case law which supports interviewing a person who is intoxicated.  The only limitation to this is if the person being interviewed is intoxicated to the point of being in a manic state."  Dkt. No. 85-11 at 9.  The Report further states that "it is a matter of training that detectives are trained on the fact that interviewing an intoxicated person is lawful, unless in this manic state."  *Id.*  The Report indicates that neither Detective thought Plaintiff was "excessively intoxicated" during the interview on May 6, 2019. *Id.* at 11, 12.  Seemingly because of such training, the Report determined that "[t]herefore, the actions by [the D]etectives during that interview were lawful and proper."  *Id.* 9.

The Report went on to conclude that Plaintiff's "claim that he was arrested and charge[d] for a crime he did not commit is true[,]" and that while Plaintiff was charged "due to his own admission[,]" "[t]he interview conducted by Det. Beauchine and then Det. Brimmer was lawful and proper.  There was no violation of any rules and regulations by Det. Beauchine or Det. Sgt.

Brimmer, or any officer." *Id.* at 12.[23]  Following that conclusion are signatures for the chief of

police, the first deputy chief, a bureau chief, a supervisor, and the investigating sergeant. *Id.* at 13.

*Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("To establish deliberate indifference

a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of

constitutional injury, but failed to take appropriate action to prevent or sanction violations of

constitutional rights."); *Donovan v. Norwich City Sch. Dist.*, No. 19-cv-1638, 2022 WL 623904,

at *11 (N.D.N.Y. Mar. 3, 2022) ("An official's title, though not dispositive of his authority to make

policy, is relevant for the interferences fairly to be drawn therefrom.") (quoting *Rookard v. Health

& Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983)).

      Drawing all reasonable inferences in Plaintiff's favor for purposes of summary judgment,

a reasonable juror could find the requirements for deliberate indifference satisfied with respect to

the Detectives' training for interrogating intoxicated individuals.  First, the apparent existence of

this very training reflects "a moral certainty" that detectives will need to interview such

individuals.  *Jenkins*, 478 F.3d at 94 (citation omitted).  Second, Detective Brimmer's own

testimony suggests that interviewing intoxicated individuals presents a "difficult choice."  *Id.*

(citation omitted); Dkt. No. 77-49 at 25:16-24 (Detective Brimmer testifying with respect to

intoxication and mental capacity during custodial interviews that "I can't think of any exact

incident where that has occurred but I do understand how, you know, severe intoxication or, you

know, severe mental health where someone's having a schizophrenic outbreak, or something to

that effect, is certainly going to affect what they're telling us. *And it would be a judgment call and

we likely would not interview that person if they're under extreme intoxication or having an*

---

[23] This portion of the Report makes clear that Detective Brimmer was subsequently promoted to Detective Sergeant, a position in which he supervises other detectives. *See also* Dkt. No. 77-49 at 12:20-13:1.

*emotional and/or mental health crisis*.") (emphasis added).  Third, Defendants' own expert indicates that the "wrong choice" can result in a false confession, and thus a deprivation of constitutional rights.  *Jenkins*, 478 F.3d at 94 (citation omitted); Dkt. No. 77-52 at 11-13; *see also* Dkt. No. 85-7 at 1 ("The district attorney said the case shows police and prosecutors need better training in identifying the dynamics of false confessions.  'While it seems counterintuitive that someone would confess to something they did not do, it happens,' [DA] Fitzpatrick said.  'And in this case, I hope all involved analyze the root causes of why this happened.[']").  Finally, the Report identifies a "specific deficiency in the city's training program," *Jenkins*, 478 F.3d at 94 (citation omitted), in that the only limitation on interrogating intoxicated individuals appears to be when they are "in a manic state,"[24] Dkt. No. 85-11 at 9.

At bottom, Plaintiff contends that the Detectives' training caused them to violate his constitutional rights, by interrogating him while he was intoxicated and coercing him into providing a false confession.  Plaintiff may well ultimately fail to prove such a claim.  *See, e.g., Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) ("[D]eliberate indifference is a stringent standard of fault.") (alteration in original) (quoting *Connick*, 563 U.S. at 61).  But he has done enough to survive summary judgment—particularly in the absence of more specific argument from Defendants regarding deliberate indifference.  According, the Motion is denied as to Plaintiff's *Monell* claim based on the Detectives' interrogation training.

---

[24] It is unclear from the current record how this limitation operates in practice, given that alcohol is a depressant while "[m]ania is a condition in which you have a period of abnormally elevated, extreme changes in your mood or emotions, energy level or activity level.  This highly energized level of physical and mental activity and behavior must be a change from your usual self and be noticeable by others."  *Mania*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/21603-mania (last visited September 29, 2025).  Neither the Report nor the Motion identify the referenced caselaw.  *See generally* Dkt. Nos. 77, 85-11, 90.

### E. Negligent Supervision and Retention under New York law

In general, "[t]o state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show[, *inter alia*,] (1) that the tort-feasor and the defendant were in an employee-employer relationship . . . ; [and] (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence[.]" *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (first citing *D'Amico v. Christie*, 518 N.E.2d 896, 901-02 (1987); and then quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 654 N.Y.S.2d 791, 793 (N.Y. App. Div. 1997)). Additionally, "[w]hen a negligence claim is asserted against a municipality or its employees, the threshold inquiry is 'whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose.'" *Velez v. City of New York*, 730 F.3d 128, 134 (2d Cir. 2013) (quoting *Applewhite v. Accuhealth, Inc.*, 995 N.E.2d 131, 134 (2013)). "Providing police protection has long been recognized as a quintessential governmental function" and when "a municipality undoubtedly acts in a governmental capacity, a plaintiff may not recover without proving that the municipality owed a 'special duty' to the injured party." *Id.* at 135 (citing *Valdez v. City of New York*, 960 N.E.2d 356, 592 (2011)).

Defendants argue, *inter alia*, that this negligence claim should be dismissed (i) against the Individual Defendants because they were all employees and cannot be held liable as an employer; and (ii) against Defendant City because its employees were acting in the scope of their employment as police officers. Dkt. No. 77-56 at 28-30. Plaintiff provides no persuasive response. Dkt. No. 85 at 33-34. The Court also notes that Plaintiff offers no evidence regarding any of the Individual Defendants' "propensity for the conduct which caused the injury," *Ehrens*, 385 F.3d at 235 (citation omitted), nor any evidence that Defendant City owed him "a special relationship beyond

the duty that is owed to the public generally," *Velez*, 730 F.3d at 135.  Accordingly, the Court grants the Motion as to Plaintiff's tenth claim.

### F.  Qualified Immunity for the Individual Defendants

Defendants argue that (i) the Individual Defendants are entitled to qualified immunity on Plaintiff's false arrest and malicious prosecution claims because of the collective knowledge doctrine and because of "plausible instructions from a superior officer;" (ii) the Individuals Defendants are entitled to qualified immunity on Plaintiff's pre-interrogation detention because the multi-hour detention was "objectively reasonable;" (iii) the Individual Defendants are entitled to qualified immunity because they had arguable probable cause to arrest Plaintiff; and (iv) the Detectives are entitled to qualified immunity with respect to Plaintiff's confession because "there is no evidence that Plaintiff was not of sound mind or so intoxicated as to render his confession involuntary[.]"  Dkt. No. 77-56 at 30-38.  Defendants do not appear to contend that they are entitled to qualified immunity as to the balance of Plaintiff's fabricated evidence claim.  *See id.*

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (*per curiam*) (citation modified).  The application of qualified immunity requires the Court to undertake a two-pronged inquiry: whether "(1) . . . the official violated a statutory or constitutional right, and (2) . . . the right was 'clearly established' at the time of the challenged conduct."  *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (alterations in original) (quoting *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016)).  Under the "clearly established" prong, the law does not require "a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.* (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see, e.g., Golino v. City of New Haven*, 950

F.2d 864, 870 (2d Cir. 1991) ("The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right."); *Ricciuti*, 124 F.3d at 128, ("The right to be free from arrest or prosecution in the absence of probable cause is a long established constitutional right."); *Weaver v. Brenner*, 40 F.3d 527, 533-34 (2d Cir. 1994) ("It is clear that [in 1989] . . . a criminal suspect could not lawfully be compelled to be a witness against himself. . . . It was also clearly established in 1989 that police could not lawfully coerce incriminating statements from an in-custody criminal suspect."); *Zahrey v. Coffey*, 221 F.3d 342, 345 (2d Cir. 2000) ("We hold that there is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity . . . . [and] that this right was clearly established in 1996[.]"); *Morse v. Fusto*, 804 F.3d 538, 541 (2d Cir. 2015) ("[T]he actions of the defendants upon which [plaintiff] bases his claims were the knowing creation of false or misleading evidence by a government officer acting in an investigative capacity.  We have held that such activity by a government official qualifies as an unconstitutional deprivation of the victim's rights.  This right was, moreover, clearly established at the time of the defendants' conduct."); *Horn v. Adger*, Nos. 24-1034, 24-1038, 2025 WL 1618761, at *3 (2d Cir. June 9, 2025) (summary order) ("On appeal, the Detectives do not contest our clearly established caselaw holding that police officers are liable under § 1983 for 'creat[ing] false information likely to influence a jury's decision and forward[ing] that information to prosecutors.'") (alterations in original) (citation omitted).  "Courts have discretion to decide the order in which to engage these two prongs." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citation omitted).

At this stage, the Court need only address the "constitutional violation" prong.  As detailed above, whether any Defendant violated Plaintiff's constitutional rights depends on numerous disputed issues of material fact.  The parties dispute, for example, when Plaintiff's detention

ripened into an arrest, *see supra* Section IV.A.1; whether the Individual Defendants had probable cause to arrest Plaintiff prior to his interrogation, *see supra* Section IV.A.2-3.a; the extent of Plaintiff's intoxication during the interrogation, as well as the voluntariness and veracity of his statements, *see supra* Section IV.A.3.b; and whether the Individual Defendants improperly initiated Plaintiff's prosecution, *see supra* Section IV.B.  Such factual disputes preclude a finding of qualified immunity at this stage.  *See, e.g., Dufort*, 874 F.3d at 343 ("We conclude that the district court's grant of summary judgment as to [plaintiff]'s false arrest and malicious prosecution claims was premature, because disputed questions of material fact remain regarding key aspects of the criminal investigation and subsequent prosecution.  We further conclude that those same questions of material fact preclude a grant of qualified immunity at the summary judgment stage.").

The Court reaches the same conclusion with respect to Defendants' arguments regarding reliance on "plausible instructions" from a superior officer and arguable probable cause.  As to the former, the limited record evidence cited by Defendants is insufficient to establish, as a matter of law, that such instructions were given.  Dkt. No. 77-55 at 34-35.  In any event, as the authority on which Defendants rely makes clear, *id.* at 35, even if such instructions were given, that does not end the inquiry.  *See Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir. 2003) ("Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists (*e.g.*[,] a warrant, probable cause, exigent circumstances).") (first quoting *Bilida v. McCleod*, 211 F.3d 166, 174-75 (1st Cir. 2000); additional citations omitted).  And the disputed factual record precludes reaching a determination with respect to this inquiry.

As to arguable probable cause, the current factual record also precludes summary judgment. *See, e.g., Napolitano*, 29 F.4th at 105 ("A police officer has arguable probable cause 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'") (quoting *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016)); *Jenkins*, 478 F.3d at 88 ("[U]nder both New York and federal law, summary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable. . . . If, however, on the undisputed facts the officer would be unreasonable in concluding that probable cause existed, or if the officer's reasonableness depends on material issues of fact, then summary judgment is inappropriate for both New York and federal false arrest claims.") (first citing *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001); and then citing *Dillard v. City of Syracuse*, 381 N.Y.S.2d 913, 915 (N.Y. App. Div. 1976)).

In sum, the disputed factual record precludes summary judgment based on qualified immunity. *See, e.g., Eaton v. Estabrook*, 144 F.4th 80, 89 (2d Cir. 2025) ("In the qualified immunity context, '[p]re-trial resolution of the defense [of qualified immunity] . . . may be thwarted by a factual dispute.' . . . 'Any disputed questions of material fact—such as the acts of the defendant and their effects on the plaintiff—are to be determined by the factfinder.'") (final alteration added) (first quoting *Warren v. Dwyer*, 906 F.2d 70, 74 (2d Cir. 1990); and then quoting *Walker v. Schult*, 45 F.4th 598, 617 (2d Cir. 2022)). Given the current factual record, Defendants have not carried their burden to demonstrate that no rational juror could conclude that they violated Plaintiff's constitutional rights. *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) ("Thus, a decision dismissing a claim based on qualified immunity at the summary judgment stage may only be granted when a court finds that an official has met his or her burden demonstrating that no

rational jury could conclude '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'") (quoting *al-Kidd*, 563 U.S. at 735).[25]

### G. John Does 1-100

Defendants also argue that because Plaintiff has not amended his Complaint, the Doe Defendants should be dismissed without prejudice. Dkt. No. 77-56 at 30. Plaintiff responds with a single sentence "reassert[ing] his request to amend the complaint to include additional defendants" and no authority in support of such a request. Dkt. No. 85 at 34.

Almost two years ago, Magistrate Judge Katz considered and denied Plaintiff's request to amend the Complaint to include two additional defendants. Dkt. No. 64. Since that time, Plaintiff has not sought a review of that decision and has not undertaken any further efforts to amend the Complaint. Plaintiff now offers no authority and no new arguments in support of his cursory request. Plaintiff's renewed request is denied for the reasons set forth by Magistrate Judge Katz, Dkt. No. 64, and all claims against the Doe Defendants are dismissed, *see, e.g., Kaczmarek v. City of Schenectady*, No. 10-cv-1193, 2013 WL 5506276, at *2 (N.D.N.Y. Oct. 4, 2013) ("Because plaintiffs have failed to timely identify and serve the John Doe defendants, plaintiffs' claims against both John Doe defendants are dismissed.").

## V.    CONCLUSION

Accordingly, the Court hereby

---

[25] Because factual disputes preclude summary judgment on the first prong of the qualified immunity inquiry, the Court makes no determination as to the second prong, as noted earlier. *Id.* at 219-220; *see also Linton v. Zorn*, 135 F.4th 19, 32 (2d Cir. 2025) ("But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.") (quoting *Tolan*, 572 U.S. at 656). For similar reasons, the Court also does not address the parties' competing expert reports. Dkt. Nos. 77-53, 77-54, 85-14.

**ORDERS** that Defendants' motion for summary judgment, Dkt. No. 77, is **GRANTED in part and DENIED in part**, as set forth in Section IV of this Memorandum-Decision and Order; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 29, 2025
       Albany, New York

Anne M. Nardacci
U.S. District Judge

69